**LEKTRO–VEND CORP., a Delaware Corporation, et al., Plaintiffs,**

v.

**VENDO COMPANY, a Missouri Corporation, Defendant.**

**No. 65 C 1755.**

United States District Court,
N. D. Illinois, E. D.

May 29, 1975.

Order Granting Preliminary Injunction
June 27, 1975.

Barnabas F. Sears, James E. S. Baker, James A. Hardgrove, Clifford E. Yuknis, Sidley & Austin, Thomas L. Brejcha, Jr., Boodell, Sears, Sugrue, Giambalvo & Crowley, Chicago, Ill., for plaintiffs.

Lambert M. Ochsenschlager, John M. Lamont, Wayne F. Weiler, Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

### I.

■ This a complex antitrust action [1] by Lektro-Vend Corporation, Harry B. Stoner and Stoner Investments, Inc., plaintiffs, against the Vendo Company, the defendant. Vendo recently obtained a $7,345,500 state court judgment against Mr. Stoner and Stoner Investments for violation of their purported fiduciary duties to Vendo. *Vendo v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1 (1974), *cert. denied*, 420 U.S. 975, 95 S. Ct. 1398, 43 L.Ed.2d 655 (1975). Plaintiffs [2] now seek a preliminary injunction preventing Vendo from taking any further steps, pending a trial of this case, to collect its state court judgment, urging that the state court proceedings did not take account of Vendo's violations of antitrust law and were prosecuted in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. For the reasons and on the conditions stated below, the motion will be granted. Insofar as required, this opinion shall constitute the Court's findings of fact

---

1. Plaintiffs also assert a civil rights claim pursuant to 42 U.S.C. § 1983 claiming certain portions of the Illinois Supreme Court decisions violated procedural and substantive due process. The Court has no jurisdiction to entertain this claim. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *Louis Ender Inc. v. General Foods Corp.*, 467 F.2d 327 (2nd Cir. 1972); *Sarelas v. Sheehan*, 326 F.2d 490 (7th Cir. 1963). As explained in *Adkins v. Underwood*, 370 F.Supp. 510, 514–15 (N.D. Ill.1974):

    "While lower federal courts were given certain power in the Judiciary Act of 1789, they were not given any power to directly review cases from state courts, and they have not been given such power since that time. . . . Only the Supreme Court is authorized to review on direct appeal the decision of state courts. From the beginning this country has had two essentially separate legal systems. Each system, federal and state, proceeds independently of the other with ultimate review in the United States Supreme Court of federal questions raised in either system.

    "Even if a state court decision is constitutionally wrong, that does not make the judgment void, it merely leaves it open to reversal or modification in an appropriate and timely appellate proceeding. Unless and until so reversed or modified, it would be an effective and conclusive adjudication. Under the legislation of Congress, no court of the United States other than the United States Supreme Court can entertain a proceeding to reverse or modify a state court judgment which is in error."

2. The motion for preliminary injunction only sought relief for Mr. Stoner and Stoner Investments, not Lektro-Vend Corporation. It is clear, however, that the hearing litigated the interests of all three plaintiffs and that Vendo acquiesced in this procedure. Plaintiffs' motion to amend the motion to include Lektro-Vend is therefore granted.

and conclusions of law. F.R.Civ.P. 52(a), 65(d).

To demonstrate the necessity of a preliminary injunction a brief excursion into the history of the relationship between the parties is required. This action has its genesis in the 1959 purchase of Stoner Manufacturing Corp. by Vendo. This sale was occasioned primarily by Mr. Stoner's health problems. At that time Stoner Manufacturing was primarily a producer of candy vending machines throughout the United States. Vendo prior to 1959 was a manufacturer of beverage and ice cream vending machines. The record in the state court proceedings and here demonstrates that Vendo had two purposes in purchasing Stoner Manufacturing: expansion of its product line[3] and elimination of Mr. Stoner as a potential competitor in the vending machine market. The parties agree that Mr. Stoner was a design genius in creating innovative vending machine products.

The sale agreement between Vendo and Stoner Manufacturing provided that Vendo would pay the Stoner interests $3,400,00 and deliver 60,000 shares of Vendo stock to Mr. Stoner. This made Mr. Stoner a major shareholder of Vendo. Mr. Stoner also became an officer and director of Vendo. His employment contract with Vendo had a five year term and his salary was $50,000 per year. The 1959 agreements also provided that Stoner Manufacturing would not directly or indirectly participate in the management, ownership or control of a vending machine business for ten years in the United States or any foreign country in which Vendo was doing business. Mr. Stoner's employment contract provided that for a period of five years following the termination of his employment, Mr. Stoner would not compete with Vendo in any territory in which Vendo was doing business or intended to do business.

Shortly after the 1959 agreements were consummated Mr. Stoner and Vendo had a falling out. Mr. Stoner had been led to believe he would be able to take an active role in research and development and would be treated as chairman of the board with respect to operation of the purchased assets of Stoner Manufacturing. In actuality Mr. Stoner was virtually ignored or bypassed by the Vendo management. The Vendo management admittedly was thus only paying Mr. Stoner not to compete rather than employing him for performance of actual services.

The succeeding events are adequately set out in the first opinion of the Illinois Court of Appeals at 105 Ill.App.2d 261, 269–77, 245 N.E.2d 263. During the fall of 1960 Mr. Stoner began financing vending machine research and development by certain former Stoner Manufacturing employees. This work culminated in the development of a revolutionary first-in-first-out (FIFO) candy vending machine, called the Lektro-Vend machine. The first prototypes of the Lektro-Vend were exhibited at a trade show in October 1962. Vendo employees were present and made initial inquiries about purchasing the design. The inventors, however, decided to manufacture and market the machine on their own. Mr. Stoner was asked to join these efforts. Thus in December 1962 Mr. Stoner sought to be released from his Vendo employment contract, stating that he wanted to invest in the Lektro-Vend machine. Mr. Stoner did not disclose at that time his previous backing of the Lektro-Vend project.

Vendo refused the release request because it did not want to compete with Stoner. Vendo officials stated that part of the consideration for the 1959 agree-

---

3. Federal Trade Commission approval was required before Vendo could purchase the Stoner vending machine interests. Apparently this was accomplished by misrepresenting to the Commission that Stoner Manufacturing and Vendo were not actual or potential competitors. The record demonstrates that at the least Vendo was a potential competitor of Stoner Manufacturing.

ments was the non-competition clauses. Instead, Stoner was requested to help Vendo purchase the Lektro-Vend from the inventors. The inventors sought $1,500,000; Vendo thought this price too high and declined to purchase the machine. Vendo also thought that there were inherent technical problems in the Lektro-Vend and that it was too costly to produce. Mr. Stoner warned Vendo that it was a serious mistake not to purchase the Lektro-Vend.

Some time shortly after the Vendo refusal to purchase the Lektro-Vend, Mr. Stoner revealed his financial support of the Lektro-Vend inventors. It appears, however, that Vendo was well aware of the Stoner involvement with Lektro-Vend as early as the 1962 trade show.

Mr. Stoner's and Stoner Investments' involvement with the Lektro-Vend inventors and the Lektro-Vend Corporation continued. Stoner Investments helped Lektro-Vend Corporation establish a production plant and further loans or loan guarantees were made by both Mr. Stoner and Stoner Investments. Meanwhile Mr. Stoner's employment contract with Vendo terminated on June 1, 1964, although Mr. Stoner remained on the Vendo board until the spring of 1965. It is clear, however, that neither Mr. Stoner nor Vendo thought until late in the state court litigation that this relationship created for Mr. Stoner any further obligations beyond those duties purportedly contained in the non-competition covenants.

In March 1965 Lektro-Vend salesmen reported that Vendo salesmen were circulating rumors in the trade that Lektro-Vend was about to go out of business. Mr. Stoner responded with a letter to 50 vending machine operators. This letter, denominated by the parties as the "Dear Operator" letter, stated that Stoner was now "interested" in Lektro-Vend Corporation and would guarantee its continued existence.

Conflict between the parties sharpened in August 1965 when Vendo brought suit against Mr. Stoner and Stoner Investments. The Court proposes to examine these proceedings only insofar as they may reflect illegal anti-competitive conduct by Vendo. The original Vendo complaint focused on alleged violation of the non-competition covenants in the employment and sales agreements and sought $500,000 in damages. This complaint was amended to add a charge of theft of trade secrets and the ad damnum was raised to $1,500,000. An injunction against Stoner and Stoner Investments preventing further aid to Lektro-Vend running until July 1, 1969 was also sought. The Illinois Appellate Court opinion after the first trial reveals that the evidence during the first trial was directed to the covenants and the trade secrets issue. After the first trial, the Illinois trial court entered judgment against Mr. Stoner for $250,000 for violation of the covenants and $1,100,000 for theft of a trade secret. The appellate court at 105 Ill.App.2d 261, 245 N.E.2d 263 reversed as to the latter, stating that Vendo had no trade secret. It is clear from all the evidence that Vendo should have known that there was no theft of a trade secret; indeed, the first Illinois Court of Appeals' decision demonstrates the effort by Vendo to prove theft of a trade secret amounted to vexatious litigation.

The Appellate Court remanded the case with directions for further hearings on damages. Before the second state trial, Vendo again raised the ad damnum, this time to $7,345,500. At trial, however, Vendo attempted to prove the entirely new theory that Stoner was legally at fault for Vendo's failure to have a FIFO machine. On this basis, the trial court entered judgment against Stoner for $170,835 for forfeiture of salary for the time in which he purportedly illegally competed, and for $7,345,500 against Stoner and Stoner Investments for the lost profits for failure of Vendo to have a FIFO machine. Mr. Stoner and Stoner Investments again appealed and the Appellate Court again reversed, stating that Vendo's failure to have a FIFO vending machine was not

attributable to the Stoner interests. The salary forfeiture was affirmed. Each side was then granted leave to appeal to the Illinois Supreme Court.

The Illinois Supreme Court reinstated the trial court judgment, predicating liability on a corporate opportunity theory. It held that as a director of Vendo Mr. Stoner breached his fiduciary duty by failing to adequately disclose his financial involvement in the Lektro-Vend machine. The court thus concluded that it could not say that Vendo would have declined to purchase the Lektro-Vend machine had adequate disclosure been made or a genuine opportunity to purchase existed. It affirmed the $7,345,500 damage award on the Vendo lost profits theory. The Stoner interests sought a rehearing on the grounds that the corporate opportunity theory denied it substantive and procedural due process because Stoner was functionally denied a trial on this issue. The Illinois Supreme Court denied the petition for rehearing and a petition for certiorari was subsequently denied by the United States Supreme Court. As noted above, the Court believes that it does not have jurisdiction to review the due process aspects of the state court proceedings; however, as will be more fully explained below, the state court proceedings must be examined by this Court for the purpose of determining whether Vendo prosecuted those cases as part of an anti-competitive scheme.[4]

## II.

Three legal issues are raised by the brief outline of facts just concluded: (1) Have plaintiffs established under the four usual requirements that a preliminary injunction is necessary? (2) Have plaintiffs met their special burden of establishing the necessity for enjoining a state court proceeding? (3) Assuming an injunction is necessary, what type of bond is appropriate?

4. The final Illinois Supreme Court opinion makes such a review imperative. The Illinois court expressly refused to consider the allegations that the state proceedings were part of

## A.

■ The four factors usually examined to determine whether interlocutory relief is appropriate are: (1) likelihood of ultimately prevailing on the merits; (2) likelihood of irreparable harm; (3) balancing the hardships; and (4) protection of the public interest.

■■ In the instant case, this Court believes that plaintiffs have demonstrated likelihood of ultimate success on both the section 1 and section 2 Sherman Act claims. The section 1 claim arises from the 1959 agreement. Under section 1 of the Sherman Act, contracts which unreasonably restrain interstate commerce are void. The federal antitrust laws make covenants not to compete which are overly broad in geographical scope or in time unreasonable restraints of trade. Once antitrust jurisdiction is invoked, the validity of the challenged covenants is measured solely under federal law, regardless of legality under state law. *Schine Chain Theatres v. United States,* 334 U.S. 110, 68 S.Ct. 947, 92 L.Ed. 1245 (1948).

■■ Under federal law a non-competition covenant is legal under two conditions:

(1) the covenant is merely ancillary to the main purpose of a lawful contract;

(2) the covenant is necessary to protect the legitimate property interests purchased by the covenantee. See *United States v. Addyston Pipe & Steel Co.,* 85 F. 271 (6th Cir. 1898), *aff'd as modified,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136. Moreover, a covenant not to compete examined in light of other monopolistic practices can be declared illegal even if otherwise lawful if it can be shown that the object and the effect of the agreement was primarily directed at the elimination of competition. *Schine Chain Theatres v. United States, supra;*

an anticompetitive scheme. Plaintiffs, having never had a trial on this issue, must be heard in the only forum now available.

*Bowl America, Inc. v. Fair Lane, Inc.,* 299 F.Supp. 1080 (D.Md.1969).

█ Here it appears that the covenants extracted were overly broad, and the facts and circumstances surrounding the 1959 agreement and subsequent activities demonstrate that their object (and effect) were primarily directed at the elimination of competition rather than protection of good will. As drafted, the covenants were intended to protect the good will of Vendo where Vendo was doing or planning to do business; they were not limited to areas in which Stoner Manufacturing was operating. Under *Addyston Pipe* and similar cases this amounts to prima facie proof of illegality. Additionally, Vendo's president admitted the major purpose and intent of the employment contract was to obtain the anticompetitive benefits accruing from the covenants. It should also be noted even after Vendo received notice that Stoner was involved in the Lektro-Vend project it refused to terminate his employment as the contract allowed. It appears to the Court that this course of conduct was adopted by Vendo in an attempt to limit Mr. Stoner's activities for the full planned term of the post-employment agreement, showing that protection of good will was not a significant goal in obtaining the covenant. Since Mr. Stoner apparently was never called upon to perform significant services for Vendo the covenant amounted to a naked agreement not to compete, solely anticompetitive in purpose and effect.

█ Vendor argues that even if the covenants are illegal under section 1 of the Sherman Act, the state court judgment did not rely on these contractual terms and therefore is unassailable. The section 1 claim does not rest alone on the theory that the state litigation was an essential part of an illegal anticompetitive scheme but rather depends on an analysis of the total circumstances surrounding creation of the 1959 agreements. The Court believes that viewed in this light the corporate opportunity theory relied on in the final state court decision cannot either in logic or as a matter of federal antitrust law be separated from the anticompetitive intent and effect of the covenants. Mr. Stoner's position as a director was dependent on the acquisition and employment contracts. He would not have become a corporate director of Vendo absent entry of the anticompetitive agreements. Additionally, his status as a director clearly was not intended to create additional duties; it only encompassed duties already undertaken as a employee of Vendo. The general rule that where a contract is only partially illegal under the antitrust laws, the illegal portions can be severed, is therefore inapposite. Here the anticompetitive clauses are essential primary elements of the bargain and thus cannot be severed, making all elements of the 1959 agreements unenforceable. See *Superior Bedding v. Serta Assoc., Inc.,* 353 F.Supp. 1143 (N.D. Ill.1972). See also *Reynolds Metals Co. v. Metals Disintegrating Co.,* 8 F.R.D. 349 (D.N.J.1948), aff'd, 176 F.2d 90 (3d Cir. 1949). Vendo's reliance on the ultimate theory of the state court litigation thus is not well taken. The 1959 agreements were cut from one piece of anticompetitive cloth and cannot be snipped apart.

█ Plaintiffs also argue that a violation of the "attempt to monopolize" proscription of section 2 of the Sherman Act occurred here. To prove violation of section 2, plaintiffs must establish three elements of proof: (1) a dangerous probability of actual monopolization in a relevant market; (2) specific intent to establish a monopoly power; and (3) overt acts. Plaintiffs need not prove that Vendo has succeeded in establishing monopoly power but must merely show that Vendo has the capacity to make a serious attempt to acquire monopoly status. *Lorain Journal v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162 (1951); *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F. 2d 579 (7th Cir. 1971).

■ In the instant case the relevant market is a recognized sub-market within the vending machine industry—coin operated food and beverage vending machines. Lektro-Vend and Vendo are actual competitors in this sub-market, although the price structure of the industry prevents absolute congruity of competition. The geographic market is nationwide in scope. Within this market the number of competitors has been steadily declining. Between 1958 and 1966 the number of vending machine manufacturers was nearly halved and the number of competitors with sales over $100,000, particularly in the candy bar section of the industry, became quite small. Within this increasingly concentrated market, Vendo maintained a significant market share. While it appears that the evidence is somewhat in conflict, Vendo's market share is most probably over 20%. The "attempt to monopolize" prohibition in section 2 was intended to "nip incipient monopolies in the bud"; with this congressional policy in mind, considering the structure of the vending machine industry, the Court believes that, unchecked, Vendo's alleged practices raise a dangerous propensity for creation of an actual monopoly.

The Court also finds that plaintiffs have produced substantial evidence that Vendo had the required specific intent to monopolize and that it performed overt acts intended to create a monopoly position. Prior to 1959, Vendo had an aggressive acquisition program to buttress its product line and market share. The courts have consistently held that such conduct, along with other evidence of anticompetitive conduct, is persuasive evidence of an attempt to monopolize. See, e. g., United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966). Vendo's uniform policy of extracting broad covenants not to compete—such as the ones involved in the instant litigation—also evidences specific intent to monopolize. In addition, there is evidence that Vendo used litigation as a method of harassing and eliminating competition.

■ The right to litigate commercial controversies comes within the penumbra of the first amendment. Cf. Eastern R. R. Pres. Conf. v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). However, if litigation is used as an integral part of a scheme attempting to monopolize and exclude competition from the marketplace, that litigation can lose its first amendment protection. Walker Process Equip. v. Food Mach. Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). As the Supreme Court stated in California Motor Transport:

> "It is well settled that First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute. . . . If the end result is unlawful, it matters not that the means used in violation may be lawful." 404 U.S. at 514, 92 S.Ct. at 613.

This holding was recently reaffirmed in United States v. Otter Tail Power Co., 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); aff'd after remand, 417 U. S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). Thus if plaintiffs can prove that Vendo's state court litigation against the Stoner interests was not a genuine attempt to use the adjudicative process legitimately, antitrust liability in the instant case under section 2 of the Sherman Act would follow. Cf. Metro Cable Co. v. CATV of Rockford, 516 F.2d 220 (7th Cir. 1975). See also Mach-Tronics Inc. v. Zirpoli, 316 F.2d 820 (9th Cir. 1963) (antitrust liability arises from anticompetitive institution of state trade secret case); Kobe, Inc. v. Dempsey Pump Co., 198 F.2d 416 (10th Cir. 1952).

There is persuasive evidence that Vendo's activities in its litigation against

the Stoner interests in Illinois state court were not a genuine attempt to use the adjudicative process legitimately. Its theft of trade secret claim was clearly non-meritorious, and litigation of this claim might well be interpreted—considering the record as a whole—as an attempt to further harass the Stoner interests and limit the amount of aid Stoner could lend Lektro-Vend. The attempt to enforce the covenants not to compete by way of injunction and damages may be similarly indication of a violation of section 2. It may also be argued that, had this litigation been legitimately undertaken to protect good will or confidential information, Vendo would have exercised its right to terminate Mr. Stoner's employment as soon as it discovered Mr. Stoner's relationship with Lektro-Vend project; instead it prolonged Mr. Stoner's employment for the full term even though he was given no duties. As noted above, the intent of this action appears to have been to lengthen the period for which the non-competition covenants would run. The purpose of this portion of the state litigation seems purely anticompetitive. If so, this scheme was successful, for the state litigation severely hampered Lektro-Vend's development.

Despite the above stated line of reasoning, defendant contends that the Supreme Court's decisions in *Bruce's Juices v. American Can Co.*, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947) and *Kelly v. Kosuga*, 358 U.S. 516, 79 S. Ct. 429, 3 L.Ed.2d 475 (1959) bar injunctive relief under the instant circumstances. These cases hold that the antitrust laws provide no defense for actions under state law for collection of debts for sale of goods and services:

> "If the contract provisions sued on in the state court do not embody or further the anti-competitive practices, then there has been no irreparable loss or damage from *violation of the antitrust law*" requiring injunctive relief.

*Response of Carolina v. Leasco Response, Inc.*, 498 F.2d 314, 319 (5th Cir. 1974).

■ However, when the precise conduct proscribed by the antitrust laws is sought to be furthered in a state court action, the antitrust defense and injunctive relief are available in federal court. *Continental Wallpaper Co. v. Lewis Voight & Sons*, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909). See also *Farbenfabriken Bayer, A. G. v. Sterling Drug, Inc.*, 307 F.2d 207 (3d Cir. 1962). *Bruce's Juices* and *Kelly* therefore do not apply. If the state court litigation was itself part of the anticompetitive scheme, a judgment arising from such litigation is not an ordinary debt.

■ On the record as a whole, the Court finds that a preliminary injunction will prevent irreparable harm, protect the public interest, and will benefit plaintiffs more than it will burden Vendo. Continued efforts at collection will prevent Lektro-Vend Corporation from marketing a promising, newly-developed vending machine. The state court collection process places insurmountable barriers in the way of raising capital for any expansion program. Moreover, collection of the state judgment will effectively place Lektro-Vend in the hands of—or at least at the disposition of—Vendo. Stoner Investments is controlled by Mr. Stoner; 78.57% of Lektro-Vend is owned by Stoner Investments. Needless to say, Vendo would also control Stoner Investments. The case or controversy requirement contained in Article III then would require dismissal of Lektro-Vend and Stoner Investments. *Cf. Mar Foods v. First Nat'l Bank of Chicago*, 73 C 1959 (N.D.Ill. November 6, 1974). Continued collection thus would eliminate two of the plaintiffs herein. Moreover, Mr. Stoner's ability to effectively prosecute this action would be severely limited by further execution of the state court case. This also amounts to irreparable harm. *Milsen v. Southland*, 454 F.2d 363 (7th Cir. 1972).

In the Court's view, the public interest also requires issuance of a preliminary injunction. Few public policies are more important than protection of competition. In the instant case, as previously mentioned, the number of competitors in the vending machine market is declining. Thus the courts have a duty to vigilantly protect the remaining competition. The balance of equities also favors plaintiffs. Vendo's state judgment is protected by judgment liens and security agreements. Stoner and Stoner Investments, despite Vendo's protestations to the contrary, have substantially complied with these agreements. Vendo has already realized over $582,000 from an escrow trust agreement. If it is ultimately successful here, its only loss will be certain interest payments which the Stoner interests concededly cannot pay. On the other hand, the Stoner interests and Lektro-Vend's losses arising from denial of the preliminary injunction will be severe, as demonstrated above. See *Semmes Motors, Inc. v. Ford*, 429 F.2d 1197 (2d Cir. 1970).

### B.

■ Because they seek an injunction against state court proceedings, plaintiffs are faced with a special burden. The anti-injunction statute, 28 U.S.C. § 2283, prohibits issuance of an injunction to stay proceedings in a state court except under three conditions: (1) when expressly authorized by an act of Congress, (2) where necessary in aid of jurisdiction, and (3) to protect or effectuate federal judgments. Moreover, the principles of comity and federalism militate against unnecessarily interfering with pending state court actions even if § 2283 is satisfied. *Mitchum v. Foster*, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972).

There is a paucity of authority on the issue of whether the injunction provisions contained in 15 U.S.C. § 26 provide express congressional authorization to grant injunctions against state court actions. *United States v. Bayer*, 135 F.

Supp. 65 (S.D.N.Y.1955) indicates that express authorization is provided while *Helfenbeing v. International Ind., Inc.*, 438 F.2d 1068 (8th Cir. 1971) states no such authority exists. The Supreme Court's decision in *Mitchum v. Foster, supra*, seems to clarify the issue. In *Mitchum*, a 42 U.S.C. § 1983 case, the Court held that to qualify under the "expressly authorized" exception of the anti-injunction statute, a federal law need not contain an express reference to § 2283 nor expressly authorize an injunction of a state court proceeding. To qualify as an expressly authorized exception the statute would, however, have to create

> "a specific and uniquely federal right or remedy, enforceable in a federal court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." 407 U.S. at 237, 928 Ct. at 2159.

■ These tests are equally applicable to antitrust actions. When Congress passed the various antitrust laws it clearly created federal rights and remedies enforceable in a federal equity court. In fact, such power was exclusively vested in the federal court system, indicating congressional approval of enjoining certain state actions, if necessary. *Cf. Lemelson v. Ampex*, 372 F. Supp. 708 (N.D.Ill.1974). This Court therefore holds that these laws, in the instant case, can only be given their intended scope by staying the state court proceedings and that § 2283 authorizes an injunction here where the state court proceedings are part of the anticompetitive scheme.

The Court also holds that § 2283 authorizes an injunction here because further collection efforts would eliminate two plaintiffs, Stoner Investments and Lektro-Vend Corp., as parties under the case or controversy provisions of Article III since they would necessarily be controlled by Vendo. Vendo's offer to place the Stoner Investment and Lektro-Vend stock under control of the Court does

not meet this problem because as a matter of substance Vendo would control both plaintiff and defendant, requiring dismissal under Article III. Thus the injunction is also necessary to protect the jurisdiction of the Court. Principles of comity and federalism do not prevent the issuance of an injunction considering the peculiar nature of this case. The federal action here is based in part on the very proceeding sought to be enjoined. If federal law is violated by continuation of the state action the paramount national interest requires court intervention.[5]

## C.

Since the Court has determined that a preliminary injunction should issue, the terms and conditions of the injunction must be determined. The first issue is what type of security must plaintiffs produce pursuant to F.R.Civ. P. 65(c). The amount of security required is within the sound discretion of the court and is intended to protect against such cost and damages as may be incurred by any party wrongfully restrained or enjoined. However, there is no liability for damages resulting from issuance of an injunction erroneously granted unless the suit was prosecuted maliciously and without probable cause. See 7 *Moore's Federal Practice* ¶65.10 at p. 98 and cases cited therein. Because the plaintiffs have placed considerable evidence in the record demonstrating illegal anticompetitive behavior on the part of Vendo, it seems unlikely that Vendo will be able to prove any compensable damage arising from issuance of this injunction. Moreover, since this injunction will not remove the pre-existing judgment liens, Vendo remains well protected. Accordingly, a nominal bond of $2,500.00 (Twenty Five Hundred Dollars) will be required. See *Scherr v. Volpe*, 466 F.2d 1027 (7th Cir. 1972); *Urbain v. Knapp Bros, Mfg.*, 217 F.2d 810 (6th Cir. 1954).

The remaining issue concerns the scope of the preliminary injunction. Such an injunction should protect plaintiffs from harm due to collection of the state court judgment while preserving the Stoner interests' assets so that Vendo will be able to collect on the judgment if it is ultimately successful. The Court believes that these two goals can be accomplished by enjoining further collection efforts but leaving intact those portions of the state decrees (and liens) which prevent transfer of any of the Stoner assets. As previously indicated, Mr. Stoner and Stoner Investments will be required to pay all taxes, utilities and maintenance from currently collected income to preserve the assets. Plaintiffs shall prepare and present on notice a draft order in conformance with the views expressed herein within ten (10) days.

It is so ordered.

## ORDER GRANTING PRELIMINARY INJUNCTION

This cause coming on for hearing on plaintiffs' motion for a preliminary injunction and the Court having considered the pleadings, the record, the evidence and argument and the post-trial briefs submitted by the parties, and the Court having made its findings of fact and conclusions of law, as more particularly appear in its Memorandum Opinion and Order dated May 29, 1975; and

It appearing to the Court:

1. That the plaintiffs have demonstrated likelihood of ultimately prevailing on the merits of their claims under Section 1 and Section 2 of the Sherman Act, as alleged in Count I of the Amended and Supplemental Complaint;

2. That the balance of equities favors plaintiffs in that the harm to defendant from the issuance of the preliminary injunction will be slight, whereas denial thereof would result in severe loss to plaintiffs;

5. The findings contained herein are interlocutory in nature necessarily based on an incomplete record. Of course, a complete trial specifically directed to the issues in this case might produce evidence requiring a different or more limited result.

3. That plaintiffs will suffer irreparable harm if a preliminary injunction is not granted in that the continued action of the defendant in collecting its state court judgments, hereinafter enjoined: (a) will prevent LEKTRO-VEND from marketing a promising, newly-developed vending machine, and put insurmountable barriers in the way of its raising capital necessary to the prosecution of its business; (b) will effectively place STONER INVESTMENTS, INC. and LEKTRO-VEND CORP. under the control of defendant, which would require dismissal of the action under Article III of the Constitution of the United States as to said plaintiffs; and (c) will severely limit the ability of the individual plaintiff effectively to prosecute this action;

4. That the public interest in protection of competition requires the issuance of a preliminary injunction; that the paramount national interest requires court intervention by a preliminary injunction herein; that the failure to issue such injunction will deprive the Court of full and effective jurisdiction of the said federal antitrust claims set forth in Count I of the Amended and Supplemental Complaint and will impair, obstruct, or render fruitless the Court's determination of said claims; and that a preliminary injunction as provided herein is necessary to protect the jurisdiction of this Court; and

The Court being sufficiently advised in the premises, it is ordered:

1. That the liens of those certain judgments in the amounts of $170,835 and $7,345,500, plus costs of suit, entered on August 13, 1971, in the cause entitled *The Vendo Co. v. Harry B. Stoner and Stoner Investments, Inc.,* General No. 65–2134 in the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois, and the two Bonds and the Security Agreement In Connection With Appeal Bonds, which Bonds and Agreement were dated and were approved December 14, 1971, by the Honorable John S. Peterson, Circuit Judge, and which were entered into in connection with said judgments, remain in full force and effect. A copy of said Security Agreement is attached hereto and marked Exhibit A, and the parties thereto shall abide the terms thereof, except that where said Security Agreement requires or permits application to the Court, such application shall hereafter be made to this Court. In order to preserve said assets subject to said judgment liens while this injunction is in force, HARRY B. STONER and STONER INVESTMENTS, INC. shall pay all taxes on, and bills for utilities and maintenance of said assets, including insurance presently covering said assets, from currently collected income.

2. That the enforcement of those certain Supplementary Proceedings to Discover Assets Citations which defendant, THE VENDO COMPANY, has caused to be issued in connection with said state court judgments, namely:

| Respondent | Date Issued |
|---|---|
| Chicago Title & Trust Co. | December 20, 1974 |
| Stoner Investments, Inc. | January 3, 1975 |
| Valley National Bank | January 3, 1975 |
| Dreyer, Foote & Streit Assoc. | January 21, 1975 |
| Harry B. Stoner | January , 1975 |
| Clifford Zabka DDS | January 21, 1975 |

be and they are hereby stayed, provided, however, that VENDO may apply to the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois, from time to time, for periodic extensions of said Citations, in order to prevent the auto-

matic termination thereof, as provided by Illinois Supreme Court Rule 277(f), and plaintiffs may not object to such applications. All assets of STONER and STONER INVESTMENTS, INC. attached as the result of said Citations are released to the extent that STONER and STONER INVESTMENTS, INC. may collect all rent, interest, dividends, salaries, bank deposits, or other amounts due and owing to them from the entities and persons named in said Citations.

3. Nothing in said Security Agreement shall preclude STONER INVESTMENTS, INC., in the ordinary course of business, from:

(a) collecting rents, interest, dividends and other income deriving from its assets for use as funds for payment of taxes, maintenance, insurance, and utilities so as to conserve and protect its assets;

(b) opening, maintaining, and using checking and savings accounts in any federally or state chartered bank in Illinois (STONER INVESTMENTS shall give notice to defendant of the establishment of any new account).

(c) paying all trade and other creditors' obligations incurred in the ordinary course of business;

(d) paying to its employees, excepting HARRY B. STONER, their ordinary salaries and wages;

(e) agreeing with any bank to completely cancel or subordinate any accounts receivable, notes or obligations which were in existence prior to January 14, 1975, including interest thereon, owing to STONER INVESTMENTS, INC. by LEKTRO-VEND CORP., to any loans to LEKTRO-VEND CORP. by such bank or other lender.

4. Plaintiffs shall be authorized to pay their reasonable attorneys fees for services and expenses in this case, but plaintiffs may not make payments therefor prior to the rendering of such services or the incurring of such expenses, and this Court's approval shall be required before any such fees or expenses are paid.

5. This order shall not be construed to prevent defendant or its agents or attorneys from participating in any pending contempt proceedings in Kane County, Illinois Circuit Court, provided that such participation is required by that Court and that the Kane County Court determines to proceed *sua sponte* with that action.

6. Until otherwise ordered by this Court, the defendant, THE VENDO COMPANY, its agents, servants, employees and attorneys, and all persons in active concert or participation with them, are enjoined from taking any further steps to enforce or collect, or attempt to enforce or collect, or commence or prosecute any related or supplementary actions or proceedings with regard to those certain judgments in the amounts of $170,835 and $7,345,500, plus costs of suit, entered on August 13, 1971, in the cause entitled *The Vendo Company v. Harry B. Stoner and Stoner Investments, Inc.*, General No. 65–2134, in the Circuit Court for the Sixteenth Judicial Circuit, Kane County, Illinois.

7. Plaintiffs shall not dissipate any assets which may be subject to the above-described judgments and they shall make no expenditures or investments out of the ordinary course without Court approval.

It is, therefore, further ordered that upon filing by plaintiffs of an undertaking in the sum of Twenty-Five Hundred Dollars ($2,500.00), in the form of a surety bond, or bond secured by the deposit of that sum in cash with the Clerk of this Court, for the payment of such costs and damages as may be incurred or suffered by defendant if it is found to have been wrongfully enjoined, there issue out of this Court, under the seal thereof, a Writ of Preliminary Injunction, restraining said defendant, its agents, servants, employees and attorneys and all persons in active concert or participation with them, from doing any of the facts prohibited herein, unless otherwise ordered by this Court.