LEKTRO–VEND CORPORATION, a Delaware Corporation, et al., Plaintiffs-Appellees,

v.

The VENDO COMPANY, a Missouri Corporation, Defendant-Appellant.

Nos. 75–1792, 75–1793.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 8, 1975.

Decided May 28, 1976.

Rehearing and Rehearing En Banc Denied July 16, 1976.

Certiorari Granted Oct, 4, 1976. See 97 S.Ct. 55.

Earl E. Pollock, Chicago, Ill., L. M. Ochsenschlager, Aurora, Ill., for defendant-appellant.

Barnabas F. Sears, James E. S. Baker, Chicago, Ill., for plaintiffs-appellees.

Before SWYGERT and SPRECHER, Circuit Judges, and WARREN, District Judge.[1]

SWYGERT, Circuit Judge.

The overall question is whether the district court properly issued a preliminary injunction in this antitrust case, thereby staying enforcement proceedings in the Illinois state courts to collect two judgments entered in a suit on an employment contract that contained a noncompetition covenant. Among the specific issues raised is whether section 16 of the Clayton Act, 15 U.S.C. § 26, comes within the "expressly authorized" exception of the anti-injunction statute, 28 U.S.C. § 2283. We hold that it does. We also hold that the district judge did not abuse his discretion in finding the plaintiffs have a likelihood of success on the merits and they would suffer irreparable injury absent an injunction. We therefore affirm the district court's grant of a preliminary injunction.

The Vendo Company is located in Kansas City, Missouri. In 1959 it was a leading manufacturer and seller of vending machines for cold beverages, ice cream, and certain other products. It did not manufacture vending machines for candy, cigarettes, sandwiches, or coffee, but was conducting research and development in that area.

Stoner Manufacturing Corporation, located in Aurora, Illinois, was principally en-

1. The Honorable Robert W. Warren, United States District Judge for the Eastern District of Wisconsin, is sitting by designation.

gaged in the manufacture of candy vending machines that had a nationwide market. Compared with Vendo it was a smaller and less diversified enterprise. Harry B. Stoner, his wife, and other members of his family owned all of the Stoner Manufacturing stock. Stoner was the president and controlled the company.

Following negotiations with Stoner, Vendo purchased the assets of Stoner Manufacturing Corporation in April 1959 with the exception of its real estate and buildings. (Upon consummation of the purchase, Stoner Manufacturing was reorganized as Stoner Investments, Inc.) The sales agreement imposed a ten-year noncompetition restriction on Stoner Manufacturing not to own, control, or manage any business engaged in the manufacture or sale of vending machines. In addition, an employment contract between Vendo and Harry B. Stoner was executed whereby the latter would serve Vendo as a consultant for five years at an annual salary of $50,000. This contract had a noncompetition covenant also. Stoner agreed that during the term of the contract and for five years following the termination of his employment he would not "[D]irectly or indirectly, in any of the territories in which the Company [Vendo] . . . is at present conducting business and also in territories which Stoner knows the Company . . . intends to extend and carry on business . . . " enter into the vending manufacturing business. The employment contract provided that Stoner "[S]hould regulate his own hours of employment and shall determine the amount of time and effort he shall devote . . . " to Vendo.[2]

Almost immediately after the Stoner Manufacturing assets were acquired by Vendo, friction developed between Stoner and his employer. Stoner complained that his services as a consultant were not being utilized and that he was being treated as a mere figurehead. Very likely this state of affairs prompted the development of the events that led to the litigation in both the state and federal courts.

For several years before the sale to Vendo, Rod Phillips was the Stoner plant superintendent and his son, Bill, the assistant superintendent. Because of their disagreement with the policies and operations of Vendo, the father and the son resigned from their respective positions in mid-1960. Bill Phillips after quitting Vendo began the design of an electronic coin detecting device and attempted to interest Stoner in financing its development. Stoner evinced interest and agreed to pay the younger Phillips $650 per month to develop the device. It was agreed that any patents on the invention would belong to Stoner Investments. By the end of 1960 a model was completed and a patent applied for. The patent was issued in October 1960 and was assigned to Stoner Investments; however, the patented device was never produced commercially.

About this same time Rod and Bill Phillips developed a machine for vending candy that was radically different from any previous machine. It combined in a novel yet practical design three existing vending machine features: stock rotation (known as "first-in, first-out"), a window to display the product to be vended, and a capacity for stocking mixed items in a single convey-

---

**2.** The full text of the noncompetition clause reads:

5. During the term of this agreement and for a period of five (5) years following the termination of his employment hereunder, whether by lapse of time or by termination as hereinafter provided, Stoner shall not directly or indirectly, in any of the territories in which the Company or its subsidiaries or affiliates is at present conducting business and also in territories which Stoner knows the Company or its subsidiaries or affiliates intends to extend and carry on business by expansion of present activities, enter into or engage in the vending machine manufacturing business or any branch thereof, either as an individual on his own account, or as a partner or joint venturer, or as an employee, agent or salesman for any person, firm or corporation or as an officer or director of a corporation or otherwise, provided however that the Company, its subsidiaries and affiliates shall be excluded from the restrictions hereof and provided also that Stoner shall be permitted to own, hold, acquire and dispose of stocks and other securities which are traded in the investment security market whether on listed exchanges or over the counter.

ance.[3] At Rod Phillips's request Stoner agreed to finance the development of this new machine; however, neither Stoner nor Stoner Investments was to have any ownership or control over the venture. Interest-free loans aggregating $200,000 were made by Stoner to the Phillipses during 1961–62. Stoner also made available a building in Aurora rent free.

By October 1962 prototypes of the machine developed by Rod and Bill Phillips had been constructed and were exhibited at a trade show in San Francisco. The machine won favorable interest in the industry. In the meantime Lektro-Vend Corporation had been organized. The original stockholders were Rod and Bill Phillips, Ruth Netrey (Stoner's sister-in-law), and several employees of the corporation.

In December 1962 Mrs. Netrey loaned the Phillipses $350,000. The loan was later increased to $525,000. The proceeds of those borrowings were used in part to pay off the $200,000 loan made by Stoner. During that same month Stoner asked Vendo to be released from his employment contract, saying that he had an opportunity to invest in the Lektro-Vend venture. Vendo refused to accede to his request and Stoner was told that Vendo itself was interested in buying the Lektro-Vend machine. Stoner was asked to learn whether Rod Phillips was interested in selling and, if so, to arrange a meeting between Phillips and representatives of Vendo. Stoner reported that Rod Phillips was asking $1,500,000.

Rod Phillips met with certain Vendo officials in January 1963 to show them the operation of the machine. Stoner was present, but took no part in the meeting. In March Stoner wrote Vendo's vice-president that he had told Phillips that he assumed in the absence of any word from Vendo that Vendo no longer had any interest in the patent. The vice-president responded that Vendo was still interested, but that the asking price was too high.

During the summer of 1963 Stoner had a conversation with Vendo's president. Upon inquiry from the latter as to the actual extent of Stoner's involvement with Phillips, Stoner said that his relationship was confined to loans which had been repaid by another person. He did not disclose that the other person was his sister-in-law.

In March 1964 Stoner Investments contracted to sell Lektro-Vend a new plant which had been built in Aurora by Stoner Investments during the previous year. The deal was financed through a bank loan which was subject to an agreement that Stoner Investments would repurchase the property in the event of default.

Stoner's contract of employment terminated June 1, 1964. During that same month Lektro-Vend issued 5,000 shares of stock to Mrs. Stoner and in July it issued 5,000 shares of stock to Stoner Investments. In March 1965 Stoner sent a letter to fifty vending machine operators in which he identified himself with the old Stoner Manufacturing Company and said that he was now interested in Lektro-Vend. He went to great lengths to recommend the Lektro-Vend product. Litigation soon followed.

Vendo sued Stoner and Stoner Investments in the Illinois state court in August 1965. In October 1965 Lektro-Vend, Stoner, and Stoner Investments sued Vendo in the federal court. The action in the state court was finally terminated in November 1974 when the Illinois Supreme Court denied a petition for rehearing of its decision affirming judgments against Stoner and Stoner Investments, Inc. in excess of $7,000,000.[4]

3. In 1959 when Stoner Manufacturing sold out to Vendo it was manufacturing a candy vending machine called a "drop shelf" machine. The Phillips's machine, which became known as the "Lektro-Vend" model, was an extension of the "drop shelf" model. After the purchase of the Stoner assets in April 1959, Vendo began experimenting with the same idea as that developed by the Phillipses. Two models were built. Vendo, however, considered the models defective in certain mechanical respects and too expensive to produce. The project was dropped.

4. In an attempt to aid the reader to better understand this complex litigation and at the same time to shorten the opinion, a summary of the state court litigation follows.

The complaint in the federal action alleged violations by Vendo of sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). The case lay dormant until June 1975 when the district court granted plaintiffs' motion for a preliminary injunction staying defendant's efforts to collect its state court judgments until the merits of the federal suit could be determined. That action precipitated the present appeal under the provisions of 28 U.S.C. § 1292(a).

I

The threshold question relates to the authority of a federal court to enjoin a proceeding pending in a state court. Specifically, the question is whether section 2283 of the Judicial Code [5] prevented the district court from issuing a preliminary injunction staying the efforts of Vendo to collect its state court judgments against Stoner and Stoner Investments, Inc.[6]

The underlying purpose of this section, grounded in federalism is "[T]o prevent needless friction between state and federal courts." *Oklahoma Packing Co. v. Oklahoma Gas & Electric Co.,* 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537, 540 (1940). The statute is to be strictly applied, *Amalgamated Clothing Workers v. Richman Bros. Co.,* 348 U.S. 511, 515–16, 75 S.Ct. 452, 455, 99 L.Ed. 600 (1955). Unless one of the three exceptions listed in the statute is evident, it constitutes an absolute ban upon a federal court injunction against a pending state court proceeding. *Atlantic Coast Line R. R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 286–87, 90 S.Ct. 1739, 1742–43, 26 L.Ed.2d 234, 240–41 (1970).

In the instant case the district court held that both the "as expressly authorized" exception and the "in aid of its jurisdiction" exception applied and issued the preliminary injunction. Since we are of the view that the judge was correct in holding the first exception applicable, we need not reach the question raised as to the second exception.

---

*Vendo v. Harry B. Stoner and Stoner Investments, Inc.*

The suit was filed in Kane County, Illinois on August 10, 1965; the complaint charged breach of noncompetition covenants; an amended complaint also charged theft of trade secrets. After a bench trial the court on December 16, 1966 found for Vendo. Judgments against Stoner for $250,000 and against both' defendants for $1,100,000 were granted. Stoner and Stoner Investments were enjoined from further acts of competition.

An appeal was taken to the Appellate Court of Illinois. That court entered its decision on January 30, 1969, *Vendo Co. v. Stoner,* 105 Ill.App.2d 261, 245 N.E.2d 263. The court held that no trade secrets were involved, the noncompetition covenants were valid and enforceable, and the covenants had been breached by the defendants. The grant of injunctive relief was affirmed. The court also held that though the trial court erred in striking the affirmative defense based on the federal antitrust laws, it was correct in denying the defense based on the Illinois antitrust laws. The cause was remanded for a determination of damages and further proceedings.

Upon remand the defendant withdrew its affirmative defense asserted under the federal antitrust laws. The trial court, after hearing evidence entered judgments against Stoner and Stoner Investments which totaled $7,363,500.

Upon a second appeal to the Illinois Appellate Court, the court decided, on September 12, 1973, *Vendo Co. v. Stoner,* 13 Ill.App.3d 291, 300 N.E.2d 632, that the trial court erred in the measurement of damages. The case was remanded for assessment of damages in accordance with the Appellate Court's original opinion.

Upon appeal to the Illinois Supreme Court on September 27, 1974, *Vendo Co. v. Stoner,* 58 Ill.2d 289, 321 N.E.2d 1, the appellate court was reversed and the trial court's judgments were affirmed. The Supreme Court in deciding the case constructed a different theory of recovery—the breach of a fiduciary obligation on the part of Stoner—than had been asserted by Vendo.

5. 28 U.S.C. § 2283 provides:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

6. The injunction preserved Vendo's lien and rights under the state court judgments. It also contained detailed provisions regulating the conduct of the judgment debtors during the pendency of the injunction.

Section 16 of the Clayton Act (15 U.S.C. § 26) provides that any person is entitled to sue for and have injunctive relief in any court of the United States having jurisdiction over the parties against threatened loss or damage from violations of the antitrust laws. The complaint in the instant case alleges violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) and reads in part:

> On or about August 10, 1965, Vendo filed suit in the Circuit Court for the Sixteenth Judicial Circuit of Illinois against Stoner and Stoner Investments. The full text of the complaint is attached to this complaint as Exhibit C. The complaint alleges that Stoner had breached his agreement not to compete of June 1, 1959 and that Stoner Investments had breached that portion of the April 3, 1959 contract of sale which sought to eliminate competition for 10 years throughout the world. As has been previously alleged, the world-wide non-competition covenants contained in the said contracts are illegal and in violation of the antitrust laws of the United States, particularly Sections 1 and 2 of the Sherman Act. The purpose of the said lawsuit is to unlawfully harass Stoner and Stoner Investments and to eliminate the competition of Stoner, Stoner Investments and Lektro-Vend. The lawsuit is part of Vendo's plan to monopolize the vending machine manufacturing business. The threats to enforce such non-competition covenants and the bringing of a suit in an attempt to enforce the illegal covenants are overt acts of Vendo in monopolization and constitute an attempt to monopolize the trade or commerce in the State of Illinois among the several states and foreign countries in the manufacture of such vending machines. Lektro-Vend, Stoner and Stoner Investments have been injured in their business and property as a direct and proximate result of these overt acts of Vendo.[7]

The question before us is whether section 16 of the Clayton Act, 15 U.S.C. § 26, should be interpreted as coming within the "expressly authorized" provision of section 2283 of the Judicial Code.

■ The Supreme Court's decision in *Mitchum v. Foster,* 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), provides guidance. In that case the Court held section 7 of the Civil Rights Act of 1871, 42 U.S.C. § 1983, came within the meaning of the "expressly authorized" exception of the anti-injunction statute. The Court initially noted that, "Despite the seemingly uncompromising language of the anti-injunction statute prior to 1948, [it was] soon recognized that exceptions must be made to its blanket prohibition if the import and purpose of other Acts of Congress were to be given their intended scope." *Id.* at 233–34, 92 S.Ct. at 2157, 32 L.Ed.2d at 712. The Court also cataloged six separate instances in which it had found federal courts empowered to enjoin state court proceedings in carrying out the will of Congress "despite the anti-injunction statute." Mr. Justice Stewart observed that "[i]n addition to the exceptions to the anti-injunction statute found to be embodied in the various Acts of Congress, the Court [has] recognized other 'implied' exceptions to the blanket prohibition of the anti-injunction statute." *Id.* at 235, 92 S.Ct. at 2158, 32 L.Ed.2d at 713. The relevant criteria to be applied in determining whether an Act of Congress comes within the "expressly authorized" exception were listed: (1) The "federal law need not contain an express reference" to the anti-injunction statute; (2) "[A] federal law need not expressly authorize an injunction of a state court proceeding in order to qualify as an exception"; and (3) "[A]n Act of Congress must have created a specific and uniquely federal right or remedy, enforceable in a court of equity, that could be frustrated if the federal court were not empowered to enjoin a state court proceeding." *Id.* at 237, 92 S.Ct. at 2159, 32 L.Ed.2d at 714. Summarizing these crite-

---

7. Other allegations specifically refer to the non-competition covenants contained in the 1959 agreements.

ria, Mr. Justice Stewart wrote: "The test . . . is whether an Act of Congress, clearly creating a federal right or remedy enforceable in a federal court of equity, could be given its intended scope only by the stay of a state court proceeding." *Id.* at 238, 92 S.Ct. at 2160, 32 L.Ed.2d at 715.

Applying these criteria to section 16 of the Clayton Act, we are of the view that it falls within the "expressly authorized" exception. *Mitchum* noted that section 1983 of the Civil Rights Act "opened the federal courts to private citizens, offering a uniquely federal remedy" in vindicating basic federal rights. *Id.* at 239, 92 S.Ct. at 2160, 32 L.Ed.2d at 716. So, too, does section 16 of the Clayton Act open the federal courts to private citizens offering a uniquely federal remedy as an important part of the enforcement provisions of the antitrust laws. The private enforcement of these laws by injunctive relief is vested exclusively within the jurisdiction of the federal courts. This jurisdiction would be frustrated if federal courts did not have the power to enjoin a state court proceeding in an appropriate case. The present situation is a classic example. Here Vendo seeks to thwart a federal antitrust suit by the enforcement of state court judgments which are alleged to be the very object of antitrust violations.

Several cases support our holding. In *Helfenbein v. International Industries, Inc.,* 438 F.2d 1068 (8th Cir. 1971), decided prior to *Mitchum,* the plaintiffs had filed suit seeking to recover treble damages for violation of the Sherman and Clayton Acts. The loss or damages claimed in the federal suit were due to one plaintiff being forced into arbitration and other plaintiffs being evicted from leased premises—consequences which under the issues presented to the federal court were alleged to have resulted from antitrust violations. The court, in upholding the trial judge's determination to deny an injunction, stated that there was no authority under the federal antitrust laws to enjoin state enforcement or remedy for collection of ordinary debts. The court found that the plaintiffs had "only remotely allude[d] to their potential loss or damage under federal law." *Id.* at 1071. There had been "no attempt in either the arbitration or eviction proceedings to enforce the very conduct . . . prohibited by the Clayton or Sherman Act." *Id.* The court found that the loss or damage done to the plaintiffs was related to their defenses as provided under *state* law. The loss did not flow from any prohibition under *federal* laws—there was no evidence that the evictions resulted from their refusal to buy according to a "tie-in" agreement they had executed with the defendants. While the court did not expressly decide that injunctive relief would have been proper had the loss or damage been intricately connected to a federal antitrust claim, it is clear from the logic of the decision that this result would have been reached.

Another decision prior to *Mitchum* reached exactly this result. In *United States v. Bayer,* 135 F.Supp. 65 (S.D.N.Y. 1955), the court held that a contract between Bayer and I. G. Farben violated the Sherman Act. As part of the afforded relief, the court enjoined an assignee of Farben from enforcing in state court royalty payments under the contract. In holding that section 2283 did not bar the injunction, the court said:

> The answer [to section 2283] is that § 4 of the Sherman Act grants the United States District Court jurisdiction "to prevent and restrain violations" of the Act. The injunction is a necessary incident to the Court's power in order to effectuate its judgment that the Bayer contracts are illegal. Simply to declare the agreement illegal and at the same time permit recovery of the proceeds would render the decree of the court quite sterile. The purpose of the decree is not only to prevent repetition of past offenses but also "to prevent the defendants from acquiring any of the fruits of the condemned project." 135 F.Supp. at 73.

*Studebaker Corp. v. Gittlin,* 360 F.2d 692 (2d Cir. 1966), is also instructive. In an appeal by a stockholder from an order of the district court enjoining the use of other

stockholder authorizations obtained without compliance with the proxy rules in a state court proceeding to obtain inspection of Studebaker's shareholders' lists, the Second Circuit held that section 2283 did not bar the injunction. The court distinguished the federal securities statutes which afford enforcement by private parties from the provisions of the National Labor Relations Act which restrict the enforcement of its provisions to the National Labor Relations Board. Judge Friendly, writing for the court, stated: "Section 16 of the Clayton Act . . . affords a closer parallel, since there as here the private suit plays an important roll in enforcement." 360 F.2d at 698. He concluded that "where the very act of prosecuting the state proceeding violated federal law . . . ," section 2283 did not stand in the way of enjoining the state court action. *Id.*[8]

When Congress enacted the various antitrust laws it created federal rights and remedies enforceable by private parties in a federal court of equity. That such powers were vested exclusively in the federal courts reflect the Congressional belief that the national objectives of the antitrust laws will be effectuated if entrusted to the jurisdiction of the federal courts. If federal courts are prohibited from enjoining state court proceedings which are part of an anticompetitive scheme in violation of the federal antitrust laws, the full scope and force of those laws will be seriously impaired. Moreover, the national interest in the preservation of competition—one of our most important public policies—would be frustrated. Accordingly, we hold that section 16 of the Clayton Act constitutes an "expressly authorized" exception to the anti-injunction provision of the Judicial Code.

■ Vendo further contends that even if the district court was not barred by section 2283 from issuing the injunction, principles of comity and federalism constitute a bar. The principle of comity has no applicability when the exclusive remedy for an injury

lies in the federal court. We are in agreement with the trial court's observation:

> Principles of comity and federalism do not prevent the issuance of an injunction considering the peculiar nature of this case. The federal action here is based in part on the very proceeding sought to be enjoined. If federal law is violated by continuation of the state action the paramount national interest requires court intervention. *Lektro-Vend Corp. v. Vendo Company,* 403 F.Supp. 527, 537 (N.D.Ill. 1975).

■ It is also argued that the district court lacked jurisdiction to reverse, review, or revise the state court judgments in a collateral attack. While the district court conceded that it had no power to directly review cases from state courts, it went on to point out that here the plaintiffs claim that "[T]he state court proceedings did not take account of Vendo's violations of antitrust law and were prosecuted in violation of sections 1 and 2 of the Sherman Act . . . ." *Id.* at 529. Therefore, the "[S]tate court proceedings must be examined by this Court for the purpose of determining whether Vendo prosecuted those cases as part of an anti-competitive scheme." *Id.* at 532. The judge additionally commented: "The final Illinois Supreme Court opinion makes such a review imperative. The Illinois court expressly refused to consider the allegations that the state proceedings were part of an anticompetitive scheme. Plaintiffs, having never had a trial on this issue, must be heard in the only forum now available." *Id.* at 532, n. 4. We agree with these comments.

## II

In determining that interlocutory relief was appropriate, the district court concluded that the plaintiffs had demonstrated a likelihood of ultimate success on the merits of their claims. Defendant attacks this ruling by arguing that there was a total failure of proof. It says that the state court judgments are based on Stoner's violation

---

**8.** *Gittlin* was cited in *Mitchum,* 407 U.S. at 237, n. 25, 92 S.Ct. at 2159, 32 L.Ed.2d at 714, in

discussing the meaning of the "expressly authorized" exception.

of fiduciary duties and do not depend (contrary to the trial judge's findings) on the noncompetition covenants. Additionally, it is argued that the covenants are lawful when tested by antitrust standards.

In the first place, defendant's attack is overbroad. As we said in *Bath Industries v. Blot,* 427 F.2d 97, 111 (7th Cir. 1970), "[I]t is not necessary that the trial court find the certainty of a wrong, a likelihood is sufficient." Furthermore, since the grant of a temporary injunction rests within the sound discretion of the trial court, *Prendergast v. New York Telephone Co.,* 262 U.S. 43, 43 S.Ct. 466, 67 L.Ed. 853 (1923), appellate review is narrow. *Scherr v. Volpe,* 466 F.2d 1027 (7th Cir. 1972).

Secondly, when the Supreme Court of Illinois affirmed the judgments on the unadvanced theory that Stoner had violated his fiduciary duties, it did not consider or decide any of the antitrust issues presented here. It did not and could not evaluate Vendo's alleged monopolistic scheme which included the enforcements of the noncompetition covenants. The district court found that the covenants were "overly broad" and that there was substantial evidence that Vendo had the "required specific intent to monopolize" in a relevant market. Given the limitations of our review, we cannot say the trial court erred.

The judge states in his memorandum opinion:

On the record as a whole, the Court finds that a preliminary injunction will prevent irreparable harm, protect the public interest, and will benefit plaintiffs more than it will burden Vendo. Continued efforts at collection will prevent Lektro-Vend Corporation from marketing a promising, newly-developed vending machine. The state court collection process places insurmountable barriers in the way of raising capital for any expansion program. Moreover, collection of the state judgment will effectively place Lektro-Vend in the hands of—or at least at the disposition of—Vendo. Stoner Investments is controlled by Mr. Stoner; 78.57% of Lektro-Vend is owned by Stoner In-

vestments. Needless to say, Vendo would also control Stoner Investments. The case or controversy requirement contained in Article III then would require dismissal of Lektro-Vend and Stoner Investments. Continued collection thus would eliminate two of the plaintiffs herein. Moreover, Mr. Stoner's ability to effectively prosecute this action would be severely limited by further execution of the state court case. This also amounts to irreparable harm. (Citations omitted.)

We are not prepared to say that the court erred in reaching these conclusions.

Defendant's last contentions are that laches, waiver, and collateral estoppel bar injunctive relief. Issues not raised in the trial court cannot be presented for the first time on appeal. *United States v. Tyrrell,* 329 F.2d 341, 345 (7th Cir. 1964). As we noted in *Hamilton Die Cast, Inc. v. United States F. & G. Co.,* 508 F.2d 417, 420 (7th Cir. 1975): [A] trial court should not be reversed on grounds that were never urged or argued below. Defendant failed to raise these issues in the trial court. Regardless of this procedural defect, we are convinced that these contentions are without merit.

The grant of interlocutory relief is affirmed.