864 F.2d 1409
 57 USLW 2421, 1988-2 Trade Cases 68,388
 INDIANA GROCERY, INC., and Preston-Safeway, Inc.,
Plaintiffs-Appellants, Cross- Appellees,
v.
SUPER VALU STORES, INC., d/b/a Cub Foods, Markkay of
Indiana, Inc., d/b/a Cub Foods, and the Kroger
Co., Defendants-Appellees, Cross-Appellants.
 Nos. 88-1625, 88-1739.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 22, 1988.
Decided Jan. 6, 1989.
Rehearing and Rehearing En Banc Denied March 7, 1989.
 
 Donald E. Knebel, Barnes & Thornburg, Indianapolis, Ind., for plaintiffs-appellants, cross-appellees.
 Patricia N. Blair, Ginsburg, Feldman & Bress, Chtd., Mark J. Spooner, Arnold & Porter, Washington, D.C., fordefendants-appellees, cross-appellants.
 Before BAUER, Chief Judge, and WOOD, Jr. and FLAUM, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 Plaintiff-appellants Indiana Grocery Co., Inc. (Indiana Grocery) and Preston-Safeway, Inc. (Preston-Safeway) appeal from the district court's grant of summary judgment to defendants on all of their federal antitrust and pendent state-law counts. 684 F.Supp. 561. The plaintiffs' charges arose from pricing activity in the Indianapolis retail grocery market between 1983 and 1985. For the reasons that follow, we affirm.I.
 
 
 2
 In mid-1982, Indiana Grocery operated 28 supermarkets in the Indianapolis area. In 1983, it sold about 13 percent of the area's groceries. Preston-Safeway in 1983 operated 12 supermarkets in the Indianapolis area and its share of area grocery sales was about 10 percent. In 1985, the owners of Indiana Grocery acquired the common stock of Preston-Safeway, which by then had already acquired additional stores from another supermarket chain that was leaving the Indianapolis area and had sold some stores to Indiana Grocery. Since 1986, all of Indiana Grocery's stores in Indianapolis have operated under the Preston-Safeway name. For simplification, we will hereinafter refer to both plaintiff-appellants as "Indiana Grocery."
 
 
 3
 Defendant-appellee The Kroger Company (Kroger) operates more than 1,400 supermarkets throughout the United States. In 1983, Kroger operated 32 supermarkets in the Indianapolis area, which together accounted for about 28 percent of area retail grocery sales. Defendant-appellee Super Valu Stores, Inc. (Super Valu), like Kroger, is a multibillion-dollar corporation. Although primarily a grocery wholesaler, Super Valu since 1980 has owned and franchised "Cub" retail food stores in various states. Cub stores are substantially larger than conventional supermarkets such as those operated by Indiana Grocery and Kroger, and offer a lower level of services to their customers in exchange for prices that normally are 6 to 10 percent lower than those of conventional stores. In late 1982, Super Valu decided to grant a Cub franchise to defendant-appellee Markkay of Indiana, Inc. (Markkay) to operate in the Indianapolis area beginning in late 1983. Thus began the entry of Super Valu and Cub into the Indianapolis retail grocery market and the events that spawned this litigation.
 
 
 4
 When the Markkay Cub opened in the autumn of 1983, other multi-grocery store firms in addition to Indiana Grocery and Kroger were operating in Indianapolis. Marsh Supermarkets, Inc., (Marsh) operated 29 stores; the Great Atlantic & Pacific Tea Co. (A & P) operated 11 (but had already decided to withdraw from the market before Cub's entry); O'Malia Food Markets, Inc. (O'Malia) operated 6; Dietel's, Inc. (Mr. D's) operated 4; Aldi, Inc., operated 4; and Seven-Eleven Supermarkets operated 4. In addition, other firms operated approximately 40 more supermarkets in the Indianapolis area.
 
 
 5
 The Markkay Cub, of course, did not just appear in Indianapolis one morning. By early 1983, Indianapolis grocers, including Indiana Grocery and Kroger, knew that Super Valu was planning to enter the area market with several Cub stores and knew of Cub stores' strategy of pricing as low or below its competitors and advertising that fact to the public. Indianapolis grocers also knew that Cub stores had been quite successful in other cities and that a substantial part of any of the Cub stores' gain in area sales would come at their loss. Existing grocers, therefore, did not sit on their hands. Kroger, for example, decided to match Cub stores' prices on most products in its stores located near anticipated Cub sites. Other competitors also reduced prices and adopted new programs in anticipation of Cub's entry.
 
 
 6
 To make a long story short, the Markkay Cub and three other Cub stores entered the Indianapolis retail grocery market between 1983 and 1986. The Cub stores' entry, as the district court put it, "engendered intense price competition among retail grocery firms." (Too intense, according to Indiana Grocery.) Indeed, prices in the Indianapolis area decreased from pre-Cub levels during the 1983-85 period and did not increase again until 1985. Even then, retail prices did not reach their pre-Cub level. By early 1985, according to the complaint, Cub stores had captured a 15 percent share of Indianapolis retail grocery sales. Nevertheless, in 1987, Kroger (with 33 stores), Marsh (with 30), Indiana Grocery (with 24), O'Malia (with 9), Mr. D's (with 5), Aldi (with 5), and Seven-Eleven (with 4), all remained in the Indianapolis retail grocery market. In addition, other firms operated approximately 38 more supermarkets.
 
 
 7
 Indiana Grocery initiated this action in February, 1985. Its original complaint alleged that Kroger, Super Valu, and Markkay each had attempted to monopolize the Indianapolis retail grocery market through predatory pricing in violation of section 2 of the Sherman Act, 15 U.S.C. Sec. 2. According to the original complaint, each defendant had priced below its average variable costs of operating in the relevant geographic market, defined as the Indianapolis Metropolitan Statistical Area ("MSA").[1] In June, 1986, Indiana Grocery amended its complaint to allege that each defendant had engaged in predatory pricing not in the Indianapolis MSA as a whole, but only in various "submarkets." The amended complaint also asserted additional claims against Super Valu and Markkay for price fixing and combination or conspiracy to monopolize in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1 and 2, and against all defendants on common law theories. After its own economist conceded in his deposition that Cub Stores' prices were not predatory, however, Indiana Grocery voluntarily dismissed its attempted monopolization claims against Super Valu and Markkay. That left Kroger as the only remaining defendant on Indiana Grocery's section 2 attempted monopolization claim. Indiana Grocery continued to allege that Super Valu and Markkay had conspired to fix maximum prices.
 
 
 8
 In the fall of 1987, the defendants filed motions for summary judgment. For purposes of its motion for summary judgment on Indiana Grocery's section 2 claim against it, Kroger accepted the former's definition of the relevant product market as supermarkets[2] and did not dispute that the Indianapolis MSA could be divided into four geographic "submarkets." Kroger also did not challenge, for purposes of its motion, Indiana Grocery's allegation that Kroger's revenues fell below its average variable costs in some submarkets during certain periods, and that the retail grocery industry is characterized by high barriers to entry.
 
 
 9
 After briefing and oral argument, the district court dismissed all of Indiana Grocery's claims. With respect to the two remaining federal antitrust claims, the court held that Indiana Grocery had failed to create a genuine issue of material fact as to any of the three elements of its attempted monopolization claim against Kroger, and that it lacked standing to press its price-fixing claim against Super Value and Markkay. The court also found each of Indiana Grocery's common law claims against the various defendants deficient under Indiana law.
 
 II.
 
 10
 This is Indiana Grocery's appeal from the district court's grant of summary judgment to defendants on all of its claims. Summary judgment is appropriate when the pleadings and supplemental materials present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Oxman v. WLS-TV, 846 F.2d 448, 452 (7th Cir.1988). "In determining whether a genuine issue of material fact exists, the court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment. On review, we consider the entire record in the same light." Oxman, 846 F.2d at 452. The Supreme Court has emphasized, however, that summary judgment may be especially appropriate in an antitrust case because of the chill antitrust litigation can have on legitimate price competition. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 594-95, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538 (1986). For this reason, an antitrust plaintiff opposing a motion for summary judgment must present evidence that tends to exclude the possibility that the defendant's conduct was as consistent with competition as with illegal conduct. Id. at 588, 106 S.Ct. at 1357.
 
 A.
 
 11
 Indiana Grocery, then, must first establish that a genuine issue of material fact exists that Kroger attempted to monopolize the Indianapolis retail grocery market. According to Indiana Grocery, Kroger used entry of Super Valu's Cub stores into Indianapolis as a "cover" for its attempt to monopolize the area market through a predatory pricing scheme. To prove attempted monopolization under section 2 of the Sherman Act,[3] a plaintiff must show (1) specific intent to achieve monopoly power, (2) predatory or anticompetitive conduct directed to accomplishing this unlawful purpose, and most important for purposes of this case, (3) a dangerous probability that the attempt to monopolize will be successful. Lektro-Vend Corp. v. The Vendo Co., 660 F.2d 255, 270 (7th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., 615 F.2d 427, 430 (7th Cir.1980). The "dangerous probability" element of the attempted monopolization offense reflects the well-established notion that section 2 of the Sherman Act governs single-firm conduct only when it threatens actual monopolization. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984).[4] The Sherman Act protects competition, not competitors, and does not reach conduct that is only unfair, impolite, or unethical. United States v. American Airlines, Inc., 743 F.2d 1114, 1119 (5th Cir.1984), cert. dismissed, 474 U.S. 1001, 106 S.Ct. 420, 88 L.Ed.2d 370 (1985). As we recently emphasized in Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 784 F.2d 1325 (7th Cir.1986),
 
 
 12
 [c]ompetition is a ruthless process. A firm that reduces costs and expands sales injures rivals--sometimes fatally. The firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit. These injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds.
 
 
 13
 Id. at 1338.
 
 
 14
 This is not to say that injury to rival firms cannot ever lead to injury to consumers and that section 2 of the Sherman Act cannot be used to prevent such injury. But section 2
 
 
 15
 must be used with the greatest caution. Action that injures rivals may ultimately injure consumers, but it is also perfectly consistent with competition, and to deter aggressive conduct is to deter competition. Thus, the plaintiff faces a stiff burden in any section 2 litigation. "It is not enough that a single firm appears to restrain trade unreasonably, for even a vigorous competitor may leave that impression. For instance, an efficient firm may capture unsatisfied customers from an inefficient rival, whose own ability to compete may suffer as a result. This is the rule of the marketplace and is precisely the sort of competition that promotes the consumer interests that the Sherman Act aims to foster. In part because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur."
 
 
 16
 Id. (quoting Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767-68, 104 S.Ct. 2731, 2739-40, 81 L.Ed.2d 628 (1984)).
 
 
 17
 Monopoly power has long been defined in the courts as the power to exclude competition or to control price, See, e.g., American Airlines, 743 F.2d at 1117 (citing United States v. E.I. du Pont Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956)), a definition we have alternatively stated in this circuit as "power over price" or "the ability to cut back the market's total output and so raise price." See, e.g., Ball Memorial Hospital, 784 F.2d at 1335. And it is with this definition that Indiana Grocery's attempted monopolization claim against Kroger runs into trouble. The output of the Indianapolis retail grocery market is, of course, groceries, and Indiana Grocery concedes that Kroger could never control the supply of groceries to the Indianapolis retail market. If so, it is very difficult to see how Kroger could ever restrict total market output and thereby raise prices.
 
 
 18
 As if this is an unimportant concession, Indiana Grocery argues that Kroger's alleged predatory pricing scheme nevertheless created a dangerous probability of monopoly power because Kroger's market share of grocery sales during the alleged predation period rose to 35 percent in the Indianapolis area as a whole and to nearly 50 percent in two submarkets. But while market share may indicate market power in certain cases, the two are not necessarily the same. Market share indicates market power only when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output. Ball Memorial, 784 F.2d at 1335. If a firm's share of market sales does not reflect control of a significant percentage of the market's productive assets, it does not indicate market power.
 
 
 19
 Other firms may be able, for example, to divert production into the market from outside. They may be able to convert other productive capacity to the product in question or import the product from out of the area. If firms are able to enter, expand, or import sufficiently quickly, that may counteract a reduction in output by existing firms.
 
 
 20
 Id. Thus, market share is at best an indicator of market power in certain cases. The ultimate inquiry in any attempted monopolization case remains whether the defendant has or reasonably might come close to having the ability to control total market output and prices, something Indiana Grocery in this case has conceded Kroger will never be able to do.
 
 
 21
 Although this concession seems to stop Indiana Grocery's section 2 attempted monopolization theory in its tracks, it does make sense. Supermarkets do not primarily produce groceries; they usually obtain them from food wholesalers or producers. It thus seems highly likely that if Kroger or any other competitor in the Indianapolis market attempted to curtail the total amount of groceries sold to Indianapolis consumers, existing competitors or new entrants could relatively easily offset that action by importing more food from Kroger's or other suppliers. Since its competitors would not need to build new productive assets or otherwise take a long time to supply customers' wants, Kroger or any competitor would probably have little success in attempting to curtail total market output.
 
 
 22
 An interesting twist on all this, however, is Indiana Grocery's assertion and Kroger's concession--for purposes of its summary judgment motion--that the retail grocery market is characterized by high barriers to entry. For Indiana Grocery's claim of high barriers, even though conceded here by Kroger for purposes of its motion for summary judgment below, seems somewhat at odds with its own concession that Kroger could never control the supply of groceries to the Indianapolis market. If, as Indiana Grocery admits, Kroger could never exercise such control, its existing competitors must be able to counteract relatively easily any attempt by Kroger to reduce the total supply of food to the area by obtaining and selling additional groceries quickly. This implies that existing firms do not face high barriers to increasing output, such as the need to acquire or build new productive assets. If such barriers to increasing output are low for existing competitors, barriers to entry would likely be low for market entrants. Of course, we cannot help but notice that Cub stores were able to enter the Indianapolis market and capture a substantial share of area grocery sales in a relatively short period of time.
 
 
 23
 The upshot of Indiana Grocery's high-barriers-to-entry argument, in any event, is that the existence of such barriers may make an otherwise implausible predatory pricing scheme more plausible.
 
 
 24
 To be predatory, it is generally agreed that a price must be below the short-run profit maximizing level and must discipline or destroy rivals such that the predator thereafter gains sustained excess (that is, monopoly) profits larger than those lost during the rival-bashing period. The uncertain future gains must greatly exceed the present actual losses to overcome the uncertainty that rivals will be destroyed or disciplined and that monopoly profits can be reaped in the face of future entry. If rivals survive or entry occurs, not only will predation be unsuccessful, but that very prospect reduces the likelihood that a challenged low price is in fact predatory.
 
 
 25
 P. Areeda, Monopolization, Mergers, and Markets: A Century Past and the Future, 75 Calif.L.Rev. 959, 965 (1987) (emphasis added). Since "[t]he success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain," Matsushita, 475 U.S. at 589, 106 S.Ct. at 1357 (emphasis in original), high barriers to entry might convince a competitor that a predatory scheme could some day pay off. Indiana Grocery's argument, then, goes like this: Since the retail grocery market is characterized by high barriers to entry, Kroger had an incentive to and did engage in its alleged predatory pricing scheme. This indicates that Kroger thought it could succeed, which in turn indicates that there was a dangerous probability that Kroger could have succeeded.
 
 
 26
 But Indiana Grocery's assertion--and Kroger's concession--that high barriers to entry exist in the Indianapolis retail grocery market hardly clinches Indiana Grocery's claim that Kroger was a likely candidate for monopoly. As the Court noted in Matsushita, the existence of high barriers to entry has more to do with maintaining monopoly power than with obtaining it (although it may have an effect on would-be predator's motive to try), and Indiana Grocery, as explained above, has conceded that Kroger could never obtain monopoly power. If a firm can never gain the power to control a given market's total output--a necessary prerequisite to obtaining power over price or monopoly power--it matters little that high barriers to entry might exist to help that firm maintain monopoly power it could never achieve. As with its market share argument, then, Indiana Grocery's concession that Kroger could never control the supply of groceries to the Indianapolis market deflates its barriers-to-entry argument.
 
 
 27
 It is obvious from all this that Indiana Grocery's section 2 attempted monopolization theory is not that Kroger aimed to drive Super Valu and all other competitors from the Indianapolis grocery market and later experience the joys of a sole survivor taking in monopoly profits. Instead, Indiana Grocery claims that Kroger's aim was to "intimidate" and "discipline" Super Valu into coming in with fewer Cub stores, changing its format, and, in the end, raising prices. According to Indiana Grocery, the net result of Kroger's scheme to intimidate or discipline Cub would, if successful, be higher prices and injury to consumers. Indiana Grocery points out that Indianapolis retail grocery prices have indeed risen somewhat since their post-Cub lows during the 1983-85 period.
 
 
 28
 Unfortunately, Indiana Grocery's theory does not implicate section 2 of the Sherman Act. At best, it poses the danger that Kroger's allegedly anticompetitive conduct could result in diminished price competition in an oligopolistic, or, at worst, a duopolistic market. Section 2, however, does not govern single-firm anticompetitive conduct aimed only at creating an oligopoly. As we pointed out above, " 'because it is sometimes difficult to distinguish robust competition from conduct with long-run anticompetitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization.' " Ball Memorial Hospital, 784 F.2d at 1338 (quoting Copperweld, 467 U.S. at 767, 104 S.Ct. at 2739 (emphasis added)).
 
 
 29
 We thus hold that the district court did not err in granting summary judgment to Kroger on Indiana Grocery's section 2 attempt claim. In our view, there simply is no genuine issue of fact that Kroger's allegedly anticompetitive conduct posed a dangerous threat of monopoly in the Indianapolis retail grocery market. In reaching this conclusion, we note that, even when viewed in a light most favorable to Indiana Grocery, this case hardly presents a clear picture of anticompetitive conduct, let alone conduct that threatened a monopoly. We do not need an economist to tell us that if an entrant brings substantial new capacity into a market with already sufficient capacity, price competition is likely to ensue and prices are destined to fall. In contrast, Indiana Grocery's "intimidation" or "disciplining" theory is necessarily speculative. As already noted, for any predatory pricing scheme to be rational, the predator must have a reasonable expectation that its near-term sacrifice will yield future gains. Under Indiana Grocery's theory, Kroger would have to recoup any losses incurred during its period of predation by charging consumers supracompetitive prices in a post-predation oligopoly or duopoly. Under that scenario, Kroger would have to assume that Super Valu's Cub stores and any other remaining competitors would be so influenced by Kroger's "disciplining" tactics that they would permit Kroger to charge supracompetitive prices. This seems to us a risky assumption. Under Matsushita, then, Indiana Grocery's section 2 claim against Kroger is particularly appropriate for summary judgment.
 
 B.
 
 30
 Indiana Grocery does not fare any better with respect to its price fixing claim against Super Valu and Markkay. In Count II of its complaint, Indiana Grocery charges that Super Valu and Markkay agreed to fix prices not to exceed those charged by the Markkay Cub's competitors. The district court held, however, that Indiana Grocery lacked standing to press this vertical maximum resale price-fixing claim. The court ruled that, because Indiana Grocery does not allege that the defendants fixed predatory prices, it cannot complain of any "antitrust injury."
 
 
 31
 The Supreme Court first articulated the antitrust injury concept in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In Brunswick, the plaintiff bowling centers sued Brunswick alleging that the latter's acquisition of failing bowling centers in the plaintiffs' market violated section 7 of the Clayton Act, 15 U.S.C. Sec. 18, which proscribes mergers that may substantially lessen competition or tend to create a monopoly. Id. at 479-80, 97 S.Ct. at 692-93. The plaintiffs sought damages pursuant to section 4 of the Clayton Act, 15 U.S.C. Sec. 15, which awards treble damages to anyone injured in business or property as a result of an antitrust violation, for the profits they would have received had Brunswick not acquired the defaulting centers but instead had allowed them to close. Id. at 481, 97 S.Ct. at 693. The Supreme Court rejected the plaintiffs' claim for damages, which essentially complained of the defendant's preservation of competition. According to the Court, to award damages based on such a theory would be inimical to the purposes of the antitrust laws, which were enacted for the protection of competition, not competitors. Id. at 488, 97 S.Ct. at 697 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, at 320, 82 S.Ct. 1502, at 1521, 8 L.Ed.2d 510 (1962)) (emphasis in original). The Court held that to recover damages on account of an antitrust violation under section 4 of the Clayton Act, plaintiffs "must prove more than injury causally linked to an illegal presence in the market. Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original).
 
 
 32
 In Matsushita, supra, the Court examined under the light of Brunswick a claim by American competitors that their Japanese counterparts agreed to fix prices for electronic equipment at low levels in the United States. According to the Court,
 
 
 33
 to satisfy Brunswick 's antitrust injury requirement, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. Respondents charge petitioners with a whole host of conspiracies in restraint of trade. Except for the alleged conspiracy to monopolize the American market through predatory pricing, these alleged conspiracies could not have caused respondents to suffer an "anti-trust injury," because they actually tended to benefit respondents. Therefore, unless, in context, evidence of these other conspiracies raises a genuine issue concerning the existence of a predatory pricing conspiracy, that evidence cannot defeat petitioners' summary judgment motion.
 
 
 34
 Id., 475 U.S. at 586, 106 S.Ct. at 1356 (citations omitted) (emphasis added).
 
 
 35
 The Court again revisited the antitrust injury test in Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). There, the country's fifth-largest beef packer, Monfort, sued under section 16 of the Clayton Act[5] to enjoin a proposed merger between the third-largest packer, Spencer Beef, and the second-largest, Excel Corporation, a wholly owned subsidiary of Cargill. Monfort claimed that the proposed merger would violate section 7 of the Clayton Act. Monfort further alleged that, after the merger, Excel would attempt to increase its market share at the expense of smaller rivals such as Monfort by bidding up the price it would pay for cattle and reducing the price it charged for boxed beef. Monfort claimed that this "cost-price squeeze" would eventually enable Excel to drive smaller firms unable to match its lower prices from the market, after which Excel would raise its prices to supra-competitive levels and more than recoup the profits lost during the plan's initial phase.
 
 
 36
 The Monfort Court identified two potential injuries to the plaintiff: (1) a threat of lost profits stemming from the possibility that Excel, after the merger, would lower it prices to a level at or only slightly above its costs in order to increase its market share, and (2) a threat of being driven out of business by the possibility that Excel, after the merger, would engage in sustained predatory pricing. With respect to the former, the Court held:
 
 
 37
 The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply ... vigorous competition. To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result, for "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition."
 
 
 38
 Id. at 116, 107 S.Ct. at 492 (quoting Arthur S. Langenderfer, Inc. v. S.E. Johnson Co., 729 F.2d 1050, 1057 (6th Cir.), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984)). As for the second potential injury to Monfort, the Court noted that because predatory or below-cost pricing is designed to eliminate competition, in contrast to "price cutting aimed simply at increasing market share," predatory pricing is a practice " 'inimical to the purposes of [the antitrust laws,' and one capable of inflicting antitrust injury." Id. 479 U.S. at 118, 107 S.Ct. at 493 (quoting Brunswick, 429 U.S. at 488, 97 S.Ct. at 697). Monfort, however, neither raised nor proved any claim of predatory pricing in the district court. Id. 479 U.S. at 119, 107 S.Ct. at 494.
 
 
 39
 Finally, we have applied Brunswick 's reasoning in a case similar to this one. In Jack Walters & Sons Corp. v. Morton Building, Inc., 737 F.2d 698 (7th Cir.), cert. denied, 469 U.S. 1018, 105 S.Ct. 432, 83 L.Ed.2d 359 (1984), a building-materials dealer alleged that a manufacturer of farm buildings conspired with competing dealers to fix maximum retail prices. We held that the plaintiff could not challenge the alleged agreement, reasoning that
 
 
 40
 even if Morton [the manufacturer] did violate the prohibition against fixing its dealers' prices, the only harm to Walters [the plaintiff] came from the fact that competing dealers (or Morton itself) would lower their prices to consumers if Walters did not. There is no suggestion that the lower prices would have been below cost; they would have been lawful prices.... [T]he loss to Walters from lawful price competition was a gain to consumers. Walters will not be be heard to complain about having to meet lawful price competition, which antitrust law seeks to encourage, merely because the competition may have been enabled by an antitrust violation.
 
 
 41
 Id. at 709.
 
 
 42
 All this does not bode well for Indiana Grocery, for its theory of damages, as noted above, is that it lost profits as a result of the alleged vertical agreement between Super Valu and Markkay to fix maximum nonpredatory prices, which is exactly the type of damage claim we rejected in Jack Walters. To avoid losing its claim to the reasoning of Brunswick, Matsushita, Cargill, and Jack Walters, however, Indiana Grocery makes three principal arguments. First, it argues that because the alleged price fixing agreement between Super Valu and Markkay would, if proved, be illegal per se under section 1, its injury necessarily is of the type the antitrust laws were intended to prevent. Second, Indiana Grocery apparently argues that it suffered antitrust injury because the prices charged by the Markkay Cub were at times below-cost or "below-market," even though it admits that Markkay's prices were nonpredatory. Finally, Indiana Grocery contends that Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), mandates that it has standing to assert its price-fixing claim against Super Valu and Markkay.
 
 
 43
 To begin with, Indiana Grocery's first argument, which in essence was recently accepted by a Ninth Circuit panel majority in USA Petroleum Co. v. Atlantic Richfield Co., 859 F.2d 687 (9th Cir.1988), runs head first into Matsushita and Jack Walters, both of which involved price-fixing agreements that, if proved, would be per se illegal under section 1 of the Sherman Act. The Court in Matsushita, as noted above, nevertheless held that the respondents in that case had to show more than a conspiracy per se illegal under the antitrust laws; they had to show an antitrust injury resulting from the illegal conduct. Similarly, in Jack Walters, we made clear that merely claiming an injury causally related to a per se illegal price-fixing agreement did not automatically allow a plaintiff to bypass the antitrust injury hurdle. We held that, under Brunswick, if a plaintiff complains of damages that result from a practice that is itself competitive, it is not alleging an antitrust injury, regardless of whether the practice was enabled by an antitrust violation, per se or not.
 
 
 44
 This makes sense. Both per se rules and the Rule of Reason are employed in antitrust cases for the same purpose: " 'to form a judgment about the competitive significance of the restraint.' " NCAA v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 103, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984) (quoting National Soc. of Professional Eng'rs v. United States, 435 U.S. 679, 682, 98 S.Ct. 1355, 1360, 55 L.Ed.2d 637 (1978)).
 
 
 45
 Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct. But whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same--whether or not the challenged restraint enhances competition.
 
 
 46
 Id. 468 U.S. at 104, 104 S.Ct. at 2961. Thus, an antitrust violation arrived at by a per se rule's presumption of illegality is not inherently any more evil than a violation determined by a Rule-of-Reason market analysis. A violation is a violation.
 
 
 47
 Moreover, the mere presence of a substantive Sherman Act section 1 violation--again, per se or not--does not by itself bestow on any plaintiff a private right of action for damages. That is the gift of section 4 of the Clayton Act, which "defines the class of persons who may maintain private damage actions under the antitrust laws." Local Beauty Supply, Inc. v. Lamaur, Inc., 787 F.2d 1197, 1200 (7th Cir.1986). And it is section 4 of the Clayton Act that gives rise to the antitrust injury requirement, not sections 1 or 2 of the Sherman Act. Brunswick, 429 U.S. at 485-86, 488-89, 97 S.Ct. at 695-96, 697; Cargill, 479 U.S. at 109, 107 S.Ct. at 488. While sections 1 and 2 of the Sherman Act focus on competitive conditions in the market as a whole, Nat'l Soc. of Professional Eng'rs., 435 U.S. at 690, 98 S.Ct. at 1364, section 4 of the Clayton Act focuses on the type of injury claimed by a particular plaintiff and demands that it be an "antitrust injury."[6] Moreover, competitors' theories of injury under section 4 deserve particularly intense scrutiny. As we noted in Ball Memorial Hospital, supra,
 
 
 48
 [w]henever the plaintiff and consumers have divergent rather than congruent interests, there is a potential problem in finding "antitrust injury." If, as in Brunswick, itself, the plaintiff and defendant are competitors, the plaintiff gains from higher prices and loses from lower prices--just the opposite of the consumers' interest. When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust.
 
 
 49
 Id., 784 F.2d at 1334.
 
 
 50
 In this case, Indiana Grocery seeks to recover under section 4 its lost profits resulting from the agreement between Super Valu and Markkay to fix the prices of Indiana Grocery's competitor, the Markkay Cub, at low but nonpredatory levels, a claim that rests not on the defendants' agreement, but on the defendants' fixing of prices at a certain level. Since that level is admittedly nonpredatory, Indiana Grocery has no legitimate beef for purposes of section 4 recovery. This is exactly the type of claim Ball Memorial tells us to guard against. The antitrust laws simply are not in the business of protecting higher-pricing grocers from lower-pricing competition. Any injury-in-fact suffered by Indiana Grocery as a result of the defendants' lawful prices, therefore, is not antitrust injury.
 
 
 51
 Which brings us to Indiana Grocery's second principal argument: that injury resulting from low, even temporarily below-cost, but admittedly nonpredatory price levels can inflict antitrust injury upon a competitor. This is nonsense. In Cargill, the Court drew a clear distinction for purposes of antitrust injury analysis between "price cutting aimed simply at increasing market share" and predatory pricing, which it defined as "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short ran and reducing competition in the long run." Cargill, 479 U.S. at 117-18, 107 S.Ct. at 493. Under the Court's analysis, the former is vigorous competition; only the latter is anticompetitive and capable of inflicting antitrust injury. Id. Here, Indiana Grocery concedes that the defendants' prices were nonpredatory, and it cannot overcome this fatal concession by arguing that the defendants' prices at times fell below its costs. In our view, Cargill, Matsushita, and Jack Walters make clear that nonpredatory pricing is competitive pricing that cannot inflict antitrust injury upon a competitor.
 
 
 52
 One last hurdle on this issue. Indiana Grocery contends that Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), mandates that it has standing to press its vertical maximum price fixing claim against Super Valu and Markkay. In Albrecht, an independent newspaper carrier claimed that he lost 300 of his 1200 customers because the newspaper's publisher and a competing carrier had agreed to fix prices at a level lower than his own. Although the plaintiff did not allege that the defendants' fixed prices were predatory, the Supreme Court reversed the lower court's refusal to direct a verdict for the plaintiff. On remand, he recovered three times his lost profits and an amount representing the reduction in the value of his going concern resulting from the defendants' pricing activity. Albrecht v. Herald Co., 452 F.2d 124, 126 (8th Cir.1971). Read in a vacuum, Albrecht might seem to prevent us from affirming the district court in this case. Albrecht, however, was decided nine years before the Court formulated the antitrust injury requirement in Brunswick and says nothing about antitrust injury or antitrust standing. It therefore does not preclude us from applying the antitrust injury concept to Indiana Grocery's price-fixing claim in this case. In our view, not to apply that concept would be contrary to the Court's decisions in Brunswick, Matsushita, and Cargill, a formidable trio that we decline to ignore.
 
 
 53
 In short, Indiana Grocery's lost profits resulting from having to meet lawful prices are not the stuff of antitrust injury.
 
 C.
 
 54
 Two more final matters. First, Indiana Grocery's contends that the district court erred in granting summary judgment to defendants on its tortious interference claim against Kroger and on its civil conspiracy claim against Super Valu and Markkay. Actually, the district court's treatment of these claims is not entirely clear. Although the court granted summary judgment to the defendant on all of Indiana Grocery's state law counts after analyzing each thoroughly under Indiana law, the court also stated that "this court will decline to exercise its pendent jurisdiction over the plaintiffs' common law claims." Although the court's handling of the state law counts was thus somewhat ambiguous, we believe that it would not have gone through such an extensive analysis of those claims and granted summary judgment to the defendants on each of them if it really meant to decline to exercise its pendent jurisdiction. The parties seem to agree. Having made that determination, we agree with the district court's disposition of Indiana Grocery's tortious interference and conspiracy claims and hereby adopt its analysis of those claims. Finally, we have reviewed Super Valu's contention that the district court erred in denying its motion for sanctions against Indiana Grocery and find no error.
 
 For these reasons, the district court is
 
 55
 AFFIRMED.
 
 
 
 [1]
 MSAs are metropolitan areas defined by the United States Department of Commerce. The Indianapolis MSA consists of Marion County and its seven contiguous counties. Kroger agrees that the Indianapolis MSA is the relevant geographic market
 
 
 [2]
 Indiana Grocery's definition of the relevant product market excluded numerous small markets and convenience stores operating in the Indianapolis area
 
 
 [3]
 Section 2 of the Sherman Act provides in pertinent part that "[e]very person who shall monopolize, or attempt to monopolize ... any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. Sec. 2
 
 
 [4]
 The Sherman Act distinguishes between concerted and independent action. Copperweld, 467 U.S. at 767, 104 S.Ct. at 2739. In contrast to Section 2, Section 1 of the Act proscribes unreasonable restraints of trade effected by contracts, combinations, or conspiracies between separate entities, even when those agreements do not threaten actual monopolization. Id. This is because "[c]oncerted activity inherently is fraught with anticompetitive risk. It deprives the market place of the independent centers of decision-making that competition assumes and demands.... Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly. Id. 467 U.S. at 768-69, 104 S.Ct. at 2740
 
 
 [5]
 Under section 16 of the Clayton Act, private parties threatened with loss or damage by a violation of the antitrust laws may seek injunctive relief. 15 U.S.C. Sec. 26
 
 
 [6]
 Apparently it is easy to confuse this point. It is tempting when performing an antitrust injury analysis to look first at the substantive antitrust provision the defendant allegedly has violated, to note next the harmful effects on competition the substantive provision is designed to prevent, to note further that some of those harmful effects might fall on parties such as the plaintiff, and to conclude, therefore, that the plaintiff should have standing to vindicate the substantive antitrust provision the defendant allegedly has violated. For example, both Indiana Grocery and the Ninth Circuit in USA Petroleum emphasize first that maximum price-fixing agreements remain illegal--indeed, illegal per se --under section 1 of the Sherman Act after the Supreme Court's recent decision in Arizona v. Maricopa County Medical Society, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Indiana Grocery next argues that because the Court in Maricopa County was concerned about the effects of fixed maximum prices on existing or potential competitors, see id. at 348, 102 S.Ct. at 2475, its claims in this case "coincide with the very reasons maximum price fixing is illegal" and "[c]onsequently, under the Brunswick test, [it] has standing to assert [its] claims." Similarly, the Ninth Circuit, after finding that the per se rules against price fixing were "intended to give entrepreneurs and independent distributors an 'even playing field,' " concluded that
 the purpose and policies of the antitrust laws are best effectuated by recognizing the "standing" of competitors to enforce the antitrust laws against price-fixing conspiracies. To put the same point differently, we conclude that the injury done to the market and to competitors by price fixing is antitrust injury--the type of injury the antitrust laws were meant to protect.
 USA Petroleum, 859 F.2d at 697. In our view, both the Indiana Grocery and the Ninth Circuit approaches stand the antitrust injury inquiry on its head.