**L&W/LINDCO PRODUCTS, INC., Plaintiff,**

v.

**PURE ASPHALT COMPANY, Defendant.**

No. 96 C 7729.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 9, 1997.

Jeffrey P. Smith, Engelman & Smith, Skokie, IL, for Plaintiff L&W/Lindco Products, Inc.

Michael J. Abernathy, Matthew A. Phillips, Bell, Boyd & Lloyd, Chicago, IL, for Defendant Pure Asphalt Company.

BUCKLO, District Judge.

I have conducted a de novo review of Magistrate Judge Denlow's Report and Recommendation. I agree with judge Denlow's well reasoned and thorough analysis. The objections are therefore overruled. Accordingly, defendant's motion to dismiss (4–1) is denied as to count I and II and granted as to count III.

### REPORT AND RECOMMENDATION

MORTON DENLOW, United States Magistrate Judge.

Plaintiff, L&W/Lindco Products, Inc. ("Lindco"), a seller of asphalt sealants for burial vaults, brings this antitrust action against Defendant, Pure Asphalt Company

("Pure Asphalt"), a competitor in the asphalt sealant market, who for years had also been Lindco's supplier. Lindco's Amended Complaint asserts three causes of action: (1) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (2) tortious interference with prospective economic advantage under Illinois law; and (3) tortious termination of an existing business relationship under Illinois law. This matter is now before the Court on Pure Asphalt's Motion to Dismiss Lindco's Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons contained herein, Pure Asphalt's Motion to Dismiss should be denied as to Counts I and II, and granted as to Count III.

## I. BACKGROUND FACTS

In 1950, Robert Lindquist ("Lindquist") began a business, originally known as L&W Products and now known as Lindco, to market asphalt-based sealants for concrete burial vaults ("sealants").[1] Lindco purchases and re-sells sealants, identified by specific product numbers, to funeral homes and other end-users. (Comp.¶ 3–7). Lindquist owns and operates Lindco and is Lindco's sole employee. (Comp.¶ 42). Beginning in 1960, Lindco contracted with Pure Asphalt to manufacture a line of burial vault sealants for Lindco. (Comp.¶ 12). Pure Asphalt, besides manufacturing sealants to Lindco's specifications, also manufactures and sells its own line of sealants and other asphalt products. (Comp.¶ 19).

Lindco and Pure Asphalt are among a small number of firms engaged in the provision of asphalt products to the domestic burial vault industry. For a Chicago-area firm, the specific submarket for these asphalt products is primarily located within the midwestern and southeastern United States. The submarket consists of concrete vault manufacturers, plus some monument companies, cemeteries, and mausoleums. As of January, 1996, Lindco's share of this submarket was between 15–35% Pure Asphalt's

share of this submarket was at least 5–10%. (Comp.¶ 16–19).

By agreement with Pure Asphalt, Lindco maintained a supply of its product labels, bills of lading, and invoices at the Pure Asphalt premises, as well as a sign identifying the location as Lindco's. Lindco stored its products on the Pure Asphalt premises, and had its products picked up or shipped to customers directly from these premises. (Comp. ¶¶ 20–21).

In 1993 through 1995, Lindco and Pure Asphalt discussed the possibility of Pure Asphalt buying Lindco. Lindquist discussed with John Francis Sr., President and owner of Pure Asphalt, an offer to sell Lindco to Pure Asphalt for $300,000 payable over ten years. (Comp.¶ 23). In mid–1995, Pure Asphalt requested and received from Lindco copies of Lindco's financial statements and other documents showing Lindco's profits and customer base. Meanwhile, John Francis Sr. assured Lindco that Pure Asphalt would continue to do business with Lindco in the future as it had in the past. (Comp.¶ 24).

In late 1995, the majority interest in Pure Asphalt was acquired by John Francis Sr.'s grandson, Jack and Mike Francis. On January 24, 1996, Lindquist met with Jack and Mike Francis at the Pure Asphalt premises to discuss the relationship between the companies. During the meeting, Mike Francis stated to Lindquist that Pure Asphalt planned to take over all of Lindco's business immediately and completely, and Pure Asphalt would only consider paying $10,000–$15,000 for his business. Lindquist was given 48 hours to think it over, and if Lindco did not agree, Pure Asphalt would begin soliciting Lindco's customers for the purpose of taking over Lindco's business. (Comp.¶¶ 25–28).

Subsequently, Pure Asphalt terminated its relationship with Lindco. Shortly thereafter, Pure Asphalt sales personnel began contacting Lindco's customers by phone, saying variously that Lindco was out of business or going out of business, and that the customers

---

1. The burial vault industry consists of firms who supply concrete liners for graves. Many jurisdictions require or recommend that a casket must be buried, not simply in the ground, but within a concrete burial vault. Manufacturers or re-sellers of such concrete vaults use asphalt-based materials to waterproof the vaults. (Comp.¶ 8).

should buy their former Lindco products directly from Pure Asphalt. Pure Asphalt sent letters to Lindco customers communicating that Lindco had been Pure Asphalt's representative and that Lindco elected to terminate the relationship. (Comp.¶¶ 29–33).

Pure Asphalt also began to market to Lindco's customers the identical line of sealants which had been conceived and marketed by Lindco. Pure Asphalt began to ship these sealants to Lindco's customers, using Lindco's labels to identify the products, except that Pure Asphalt cut off those parts of the labels which identified the product as Lindco sealants. Pure Asphalt since January, 1996, has represented that it would sell its imitation Lindco sealant line of products to Lindco's retail customers at wholesale price, and in at least one case, has lowered its price to a Lindco customer to a level below that given to other Pure Asphalt customers. Pure Asphalt also ceased supplying Lindco with any of the products it had previously manufactured for Lindco. (Comp.¶¶ 34–37). Lindco claims that the purpose of this action on the part of Pure Asphalt was to eliminate Lindco as a competitor and to attempt to monopolize the asphalt-based burial vault sealant submarket. (Comp.¶¶ 38–41).

## II. MOTION TO DISMISS STANDARD

In ruling on a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court accepts as true all well-pleaded facts and it draws all reasonable inferences in the light most favorable to plaintiff. *Palda v. General Dynamics Corp.*, 47 F.3d 872, 874 (7th Cir.1995). The issue on such a motion is not whether plaintiff will ultimately prevail, but whether it is entitled to offer evidence to support its claim. *Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir.1995). Complaints are to be read liberally, and the court may grant the motion only "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which entitles him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Thompson v. Boggs*, 33 F.3d 847, 852 (7th Cir.1994). This rule applies with no less force to a Sherman Act claim. *McLain v. Real Estate Board of New Orleans, Inc.*, 444

U.S. 232, 246, 100 S.Ct. 502, 511, 62 L.Ed.2d 441 (1980); *Genser v. Int'l Brotherhood of Electrical Workers, Local No. 134*, 522 F.Supp. 1153 (N.D.Ill.1981).

The Supreme Court has cautioned that because of the nature of most antitrust cases, summary procedures should be used "sparingly." *Poller v. Columbia Broadcasting Sys.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Nevertheless, if there is no reasonable prospect that the plaintiff can make out a cause of action from the events narrated in the complaint, "the heavy costs of modern federal litigation, especially antitrust litigation, and the mounting caseload pressures on the federal courts, counsel against launching parties into pretrial discovery." *Sutliff, Inc. v. Donovan Companies, Inc.*, 727 F.2d 648, 654 (7th Cir.1984).

## III. LINDCO STATES A CLAIM FOR ATTEMPTED MONOPOLIZATION UNDER SECTION 2 OF THE SHERMAN ACT

Pure Asphalt's motion to dismiss Count I should be denied because Lindco's Amended Complaint states a claim for attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2"). To prove an attempted monopolization claim under the Sherman Act, Lindco must show: (1) a specific intent on the part of Pure Asphalt to acquire monopoly power; (2) anticompetitive or predatory conduct directed at that goal; and (3) a dangerous probability that Pure Asphalt will succeed in acquiring monopoly power. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 890–91, 122 L.Ed.2d 247 (1993); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.1989). Lindco need not prove that Pure Asphalt has succeeded in establishing monopoly power but must merely show that Pure Asphalt has the capacity to make a serious attempt to acquire monopoly status. *Lorain Journal Co. v. United States*, 342 U.S. 143, 153, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951); *Lektro–Vend Corp. v. Vendo Co.*, 403 F.Supp. 527, 533 (N.D.Ill.1975), aff'd, 545 F.2d 1050 (7th Cir.1976).

## A. Dangerous Probability of Success

■ Lindco's Amended Complaint sufficiently alleges that Pure Asphalt poses a dangerous probability of acquiring monopoly power in the asphalt sealant market. The "dangerous probability" element requires allegations that Pure Asphalt had sufficient market power to threaten actual monopolization within the relevant market. *Indiana Grocery*, 864 F.2d at 1413. The Seventh Circuit defines market power as the "power over price" or "the ability to cut back the market's total output and so raise prices." *Id.* at 1414. The definition of the relevant market is dependent upon the special characteristics of the industry involved. *U.S. v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 359, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658 (1970).

### 1. Market Power

■ Lindco alleges that Pure Asphalt has the market power to threaten actual monopolization. Specifically, Lindco alleges that Pure Asphalt has already captured, or is well on the way to capture, 40% of the asphalt sealant market, making it the largest single supplier, and that Lindco itself is near going out of business, thereby ceding its 35% market share. (Comp.¶ 39). Lindco further alleges that "only a small number of firms are engaged in the provision of asphalt products to the domestic burial vault industry, and the number of competitors for this market has been declining." (Comp.¶ 15). These allegations support the inference that Pure Asphalt may have sufficient market power to threaten actual monopolization. *Lektro–Vend*, 403 F.Supp. at 534.

*In Lektro–Vend*, the court held that the defendant's alleged practices "raise[d] a dangerous propensity for creation of an actual monopoly." *Lektro–Vend*, 403 F.Supp. at 534. In reaching this determination, the court emphasized that the defendant maintained a significant market share—"most probably over 20%." *Id.* The court further

emphasized that "the number of competitors [had] been steadily declining within the relevant market." *Id.* Similarly, Lindco alleges that Pure Asphalt's market share may increase to 40% or more (Comp.¶ 39), and that the number of competitors in the submarket has been declining (Comp.¶ 15).

Pure Asphalt maintains that Lindco's market share allegation, as a matter of law, cannot support a claim for attempted monopoly. "A dangerous probability of success generally requires a showing that the defendant's market share exceeds 50 percent." (Mem. in Support of Motion to Dismiss p. 10). To support this proposition, Pure Asphalt cites *Indiana Grocery and Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir.1981). However, neither of these cases support Pure Asphalt's contention.

In *Vendo*, although a 30% market share, standing alone, was insufficient to establish a dangerous probability, the court noted that market performance, "while relevant [to monopoly power], is by no means dispositive." *Vendo*, 660 F.2d at 271. Similarly, in *Indiana Grocery*, the court emphasized that "market share is at best an indicator of market power." *Indiana Grocery*, 864 F.2d at 1414 [2] Accordingly, Pure Asphalt's alleged 40% potential market share does not preclude Lindco from proving at trial the "dangerous probability" element because market share is not dispositive of market power.

### 2. Relevant Market

■ In addition to alleging sufficient market power, Lindco's Amended Complaint adequately defines a relevant market. To establish the "dangerous probability" element, a Section 2 antitrust plaintiff must allege sufficient market power in terms of the relevant market for the product involved. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455–56, 113 S.Ct. 884, 890, 122 L.Ed.2d 247 (1993). There are two components in the concept of relevant market: relevant product market and relevant geographic market. *Id.*

**2.** "While market share may indicate market power in certain cases, the two are not necessarily the same. Market share indicates market power only when sales reflect control of the productive assets in the business, for only then does it reflect an ability to curtail total market output. If a firm's share of the market sales does not reflect control of a significant percentage of the market's productive output, it does not indicate market power." *Indiana Grocery*, 864 F.2d at 1414.

■ Lindco defines the relevant product market as "asphalt-based sealants for waterproofing concrete burial vaults." (Comp. ¶¶ 8, 15). Lindco defines the relevant geographic market as "the midwestern and southeastern United States." (Comp.¶ 16). Although Pure Asphalt questions Lindco's relevant product market[3] and geographic market[4] definitions, such market definitions are fact questions, ordinarily determined at trial. *Kaiser Aluminum & Chem. Corp. v. FTC*, 652 F.2d 1324, 1329 (7th Cir.1981). Accordingly, for purposes of motion to dismiss under Fed.R.Civ.P. 12(b)(6), Lindco has sufficiently defined a relevant market.

## B. Predatory or Anticompetitive Acts

■ Lindco's Amended Complaint sufficiently alleges predatory or anticompetitive acts designed to seize monopoly power. Anticompetitive conduct must be such that its anticipated benefits are dependent upon its tendency to frustrate or eliminate competition and thereby enhance the defendant's long term ability to reap the benefits of monopoly power. *Heileman, Brewing Co., Inc. v. Anheuser–Busch Inc.*, 676 F.Supp. 1436, 1473–74 (E.D.Wis.1987).

■ Anticompetitive conduct can rise to a Section 2 Sherman Act violation in numerous ways. Although Pure Asphalt claims an absolute right to "deal (or refuse to deal) with whomever it chooses," it is firmly established that Section 2 of the Sherman Act "prohibits an enterprise from refusing to deal with another entity when this course of action is undertaken in furtherance of monopolization." *Lorain Journal Co. v. United States*, 342 U.S. 143, 154, 72 S.Ct. 181, 186, 96 L.Ed. 162 (1951). Lindco alleges that Pure Asphalt, without any notice, refused to deal with Lindco by "ceas[ing] to supply Lindco with products" and did so "with the specific knowledge that Lindco had open invoices to be filled." (Comp.¶ 37). Lindco further alleges that the "purpose of this re-

fusal to deal was to attempt to gain monopoly power over the asphalt sealant market." (Comp.¶ 40).

■ Lindco further alleges that since January, 1996, Pure Asphalt began to engage in predatory pricing. "Pure Asphalt has represented that it would sell its imitation Lindco sealant line of products to Lindco's retail customers at wholesale price, and in at least one case, has lowered its price to a Lindco customer to a level below that given to other Pure Asphalt customers." (Comp.¶ 36). Predatory pricing, as condemned by the antitrust laws, involves the "deliberate sacrifice of current revenues through lower prices for the purpose of driving rivals out of the market." *Ashkanazy v. I. Rokeach & Sons, Inc.*, 757 F.Supp. 1527, 1534 (N.D.Ill.1991). Lindco alleges that the purpose of Pure Asphalt's price cutting was to "eliminate Lindco as a competitor" and "attempt to gain monopoly power." (Comp.¶¶ 39–40).

Lindco further alleges that Pure Asphalt wrongfully appropriated Lindco's customer list and sealant formulas, used Lindco's product numbers and labels, and made false representations to Lindco customers. (Comp. ¶¶ 29–35). Lindco alleges that the purpose of these acts was to eliminate Lindco as a competitor in an attempt to gain monopoly power. (Comp.¶¶ 39–40). Although courts should be reluctant to convert ordinary business torts into antitrust violations, the anticompetitive conduct alleged by Lindco sufficiently state a claim under Section 2 of the Sherman Act. It cannot be said that no set of facts would substantiate these allegations.

## C. Specific Intent

■ Lindco's Amended Complaint sufficiently alleges a specific intent to achieve monopoly power. Although consistently listed in the Seventh Circuit as a separate inquiry from the predatory conduct requirement, specific intent is often established by the same evidence that is used to prove exclu-

---

**3.** Pure Asphalt contends that the relevant product market is much larger than Lindco claims because asphalt manufacturers currently supplying the construction industry should in fact be considered competitors and included in the relevant product market. (Reply Mem., p. 7).

**4.** Pure Asphalt maintains that the relevant geographic region is broader than Lindco claims because absent from Lindco's market is the entire northeastern United States, which contains numerous competitors.

sionary conduct. *Ashkanazy,* 757 F.Supp. at 1534-35; *Spectrum Sports,* 506 U.S. at 457, 113 S.Ct. at 892.

▇ A showing of specific intent to monopolize implies an intent to control prices and destroy competition. *Ashkanazy,* 757 F.Supp. at 1534 (citing *United States v. Empire Gas Corp.,* 537 F.2d 296, 302 (8th Cir. 1976)). In *Empire Gas Corp.,* the plaintiff established evidence that the defendant had cut or threatened to cut prices to prevent competitors from soliciting customers. The court held that such an attempt demonstrated an intent to obtain monopoly power. *Empire Gas Corp.,* 537 F.2d at 302. Similar to *Empire Gas Corp.,* Lindco alleges that in at least one known instance, Pure Asphalt has already exercised selective pricing by lowering its price to an existing Lindco customer to a level below that given to other Pure Asphalt customers and by representing that it would sell its imitation-Lindco sealant line of products to Lindco's retail customers at wholesale prices. (Comp.¶ 36). This allegation demonstrates an intent to control prices and destroy competition. *Empire Gas Corp.,* 537 F.2d at 302.

**D. Injury to Competition**

▇ The antitrust laws were enacted "for the protection of competition, not competitors." *Brown Shoe Co. v. US.,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). Hence, an antitrust plaintiff may not merely allege that the defendant's conduct has harmed its business. Rather, it must allege that the defendant's conduct has injured competition market-wide. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101,-1110 (7th Cir.1984). Pure Asphalt maintains that Lindco's Amended Complaint fails because Lindco alleges inherently procompetitive conduct in the form of heightened price competition. (Mem. in Support of Motion to Dismiss p. 7).

Pure Asphalt, however, mischaracterizes Lindco as complaining of increased competition. Rather, Lindco complains that Pure Asphalt, without notice, terminated the relationship and committed other wrongful acts in order to appropriate Lindco's market share for itself and to gain monopoly power.

(Comp.¶ 1). "If Pure Asphalt has already become, or (if not stopped) will become, the dominant supplier in the market," Lindco alleges that "there is every reason to believe that it can do more of what it has already succeeded in doing in at least one instance," namely "spot price cutting and other means to drive out competition." (Pl. Response p. 9).

Given the standard that Lindco must be granted every possible inference, it is clear that Lindco has pleaded the necessary combination of overt acts, wrongful intent, and significant probability necessary to state a cause of action for attempted monopolization under Section 2 of the Sherman Act. Proof is different than pleading, and at this point, given the strong, directive that such fact-dependent cases should not be summarily dismissed, Lindco is entitled to the inferences which support its Section 2 antitrust count.

## IV. LINDCO STATES A CLAIM FOR TORTIOUS INTERFERENCE WITH ECONOMIC EXPECTANCY

▇ Pure Asphalt's motion to dismiss Count II should be denied because Lindco's Amended Complaint states a claim for tortious interference with economic expectancy under Illinois law. To plead a cause of action for a tortious interference with economic expectancy, a plaintiff must allege: (1) a reasonable expectation of entering into a valid business relationship; (2) defendant's knowledge of the expectancy; (3) defendant's intentional and malicious interference to defeat the expectancy; and (4) damages suffered as a result of the interference. *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 527, 137 Ill.Dec. 409, 412, 546 N.E.2d 33, 36 (2d Dist.1989). A plaintiff must also plead facts to show interference of a business relationship with specific third parties. *Id.*

▇ Lindco alleges all of the necessary elements to state a claim for tortious interference. On the basis of Lindco's efforts and expenditures, and its longstanding and dependable services, Lindco alleges that it had a legitimate expectancy of continuing

business from its customers. (Comp.¶ 40). Second, Lindco alleges that Pure Asphalt knew of the relationships between Lindco and its customers. (Comp.¶ 41). Third, Lindco alleges injury, in that it was placed at a "competitive disadvantage," and that "since January 26, 1995, [Lindco] saw its sales decline by nearly two-thirds." (Comp.¶¶ 38–39).

■ Finally, Lindco alleges intentional interference to defeat the expectancy. Pure Asphalt contends that Lindco "has not alleged and cannot demonstrate that Pure Asphalt, in soliciting Lindco's customers, was not acting in furtherance of its own legitimate interests." (Mem. In Support of Motion to Dismiss p. 13). However, intentional or wrongful conduct is supported by claims that the interference was accomplished, as Lindco adequately alleges, through misrepresentations and price-cutting. *Ashkanazy,* 757 F.Supp. at 1556. Accordingly, Lindco sufficiently alleges the necessary elements to state a cause for tortious interference with economic expectancy.

## V. LINDCO FAILS TO STATE A CLAIM FOR TORTIOUS TERMINATION OF BUSINESS RELATIONSHIP

■ Pure Asphalt's motion to dismiss Count III should be granted because Lindco's Amended Complaint fails to state a claim for tortious termination of a business relationship. Lindco alleges that "Pure Asphalt had a duty to use good faith and fair dealing in its business relationship with Lindco" and that "Pure Asphalt intentionally and without justification or reasonable notice terminated its business relationship with Lindco." (Comp.¶¶ 40–41).

Lindco purports to assert a claim for tortious interference based on Pure Asphalt's decision to sever its relationship with Lindco. However, in *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 754 F.2d 216, 221 (7th Cir.1985), the Seventh Circuit noted that, generally, "a party cannot be liable in tort for interfering with its own contract, or even for breaching its own contract." *See also Williams v. Weaver,* 145 Ill.App.3d 562, 570, 99 Ill.Dec. 412, 417–18, 495 N.E.2d 1147, 1152–53 (1st Dist.1986) (defendant could not tortiously interfere with its own business relationship with plaintiff). Lindco's allegations do not state a claim that will lie for a breach or termination of a contract or relationship between itself and Pure Asphalt.

## VI. CONCLUSION

For the foregoing reasons, **it is hereby recommended that Pure Asphalt's motion to dismiss be DENIED as to COUNTS I and II, and GRANTED as to COUNT III.**